[No. S054115. June 26, 1997.]

SINCLAIR PAINT COMPANY, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant;
DEPARTMENT OF HEALTH SERVICES et al., Interveners and
Appellants.

COUNSEL

Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Lawrence K. Keethe and William L. Carter, Deputy Attorneys General, for Defendant and Appellant and for Interveners and Appellants.

National Center for Youth Law, Alice Bussiere, Patrice McElroy, Long & Levit, Joyce C. Wang, Stephen P. Randall, Abrams & Abrams, Abrams & Hebert, William F. Abrams and William N. Hebert for Interveners and Appellants.

Carol A. Korade, City Attorney (Alameda), Jerome F. Coleman, City Attorney (Burlingame), Robert G. Boehm, City Attorney (Chico), Scott H. Howard, City Attorney (Glendale), John L. Cook, City Attorney (Indian Wells), Michael D. Milich, City Attorney (Modesto), Daniel J. McHugh, City Attorney (Redlands), Samuel L. Jackson, City Attorney (Sacramento), Louise Renne, City Attorney (San Francisco), Thomas Owen, Deputy City Attorney, Paul M. Valle-Riestra, Assistant City Attorney (Walnut Creek), Ruth Sorensen, Catherine I. Hanson, Ellen G. Widess, Alden, Aronovsky & Sax and Ronald G. Aronovsky as Amici Curiae on behalf of Defendant and Appellant and Interveners and Appellants.

Livingston & Mattesich, Gene Livingston and Rebecca M. Ceniceros for Plaintiff and Respondent.

Jonathan M. Coupal, Trevor A. Grimm, Sharon L. Browne, Jeffrey Sinsheimer, Nielsen, Merksamer, Parrinello, Mueller & Naylor, John E. Mueller, Eric J. Miethke, Pillsbury, Madison & Sutro, Jeffrey M. Vesely and Richard E. Nielsen as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

CHIN, J.—In 1991, by simple majority vote, the Legislature enacted the Childhood Lead Poisoning Prevention Act of 1991 (the Act) (Stats. 1991, ch. 799, § 3, amended Stats. 1995, ch. 415, § 5; see Health & Saf. Code,

§ 105275 et seq.).[1] The Act provided evaluation, screening, and medically necessary follow-up services for children who were deemed potential victims of lead poisoning. The Act's program was entirely supported by "fees" assessed on manufacturers or other persons contributing to environmental lead contamination. (See §§ 105305, 105310.) The question arises whether these fees were in legal effect "taxes" required to be enacted by a two-thirds vote of the Legislature. (See Cal. Const., art. XIII A, § 3.)

Contrary to the trial court and Court of Appeal, we conclude that the Act imposed bona fide regulatory fees, not taxes, because the Legislature imposed the fees to mitigate the actual or anticipated adverse effects of the fee payers' operations, and under the Act the amount of the fees must bear a reasonable relationship to those adverse effects. Accordingly, the trial court erred in granting summary judgment to award plaintiff Sinclair Paint Company (Sinclair) a refund of the fees it paid under the Act.

We take the following statement of uncontradicted facts largely from the Court of Appeal opinion in this case. Sinclair paid $97,825.26 in fees for 1991. After the Board of Equalization (the Board) denied Sinclair's administrative claim for refund, Sinclair filed a complaint for refund, alleging the fees assessed under section 105310 were "actually taxes imposed by the California [L]egislature in violation of Proposition 13, Article XIIIA, Section 3 of the California Constitution." The court granted the request of the Department of Health Services (the Department) for leave to intervene. It also granted a similar request to intervene by Ray Cochenour and Cardaryl Commodore, representatives of a class of children suffering from lead poisoning, and People United for a Better Oakland, an unincorporated association whose members include the Act's intended beneficiaries (collectively Cochenour).

Sinclair moved for summary judgment, claiming the Act was invalid on its face because it was not passed by the requisite two-thirds majority vote of the Legislature. The court agreed the Act imposed an unconstitutional tax and granted Sinclair's motion.

The Board, the Department, and Cochenour appealed, contending the Act involves a regulatory fee, not a tax. Appellants also argued the court erred in granting Sinclair summary judgment without compelling it to produce discovery and improperly relied on legislative history in determining the Act's constitutionality. The Court of Appeal affirmed the judgment, concluding that the Act was unconstitutional on its face and rejecting appellants' other claims. We reverse the Court of Appeal's judgment.

[1] All further statutory references are to the Health and Safety Code unless otherwise noted.

DISCUSSION

I. *The Childhood Lead Poisoning Prevention Act of 1991*

When the Legislature enacted the Act in 1991, it explained the Act's background and purpose in findings that described the numerous health hazards children face when exposed to lead toxicity and declared four state "goals," namely, (1) evaluating, screening, and providing case management for children at risk of lead poisoning, (2) identifying sources of lead contamination responsible for this poisoning, (3) identifying and utilizing programs providing adequate case management for children found to have lead poisoning, and (4) providing education on lead-poisoning detection and case management to state health care providers. (Stats. 1991, ch. 799, § 1.)

The Act directs the Department to adopt regulations establishing a standard of care for evaluation, screening (i.e., measuring lead concentration in blood), and medically necessary follow-up services for children determined to be at risk of lead poisoning. (§ 105285; see § 105280, subd. (e).) If a child is identified as being at risk of lead poisoning, the Department must ensure "appropriate case management," i.e., "health care referrals, environmental assessments, and educational activities" needed to reduce the child's exposure to lead and its consequences. (§§ 105280, subd. (a), 105290.) Additionally, the Act requires the Department to collect data and report on the effectiveness of case management efforts. (§ 105295.)

The Department has "broad regulatory authority to fully implement and effectuate the purposes" of the Act. (§ 105300.) This authority "include[s], but is not limited to," the development of protocols for screening and for appropriate case management; the designation of laboratories qualified to analyze blood specimens for lead concentrations, and the monitoring of those laboratories for accuracy; the development of reporting procedures by laboratories; reimbursement for state-sponsored services related to screening and case management; establishment of lower lead concentrations in whole blood than those specified by the United States Centers for Disease Control for lead poisoning; notification to parents or guardians of the results of blood-lead testing and environmental assessment; and establishment of a periodicity schedule for evaluating childhood lead poisoning. (§ 105300.)

The Act states that its program of evaluation, screening, and follow-up is supported *entirely* by fees collected under the Act: "Notwithstanding the scope of activity mandated by this chapter, in no event shall this chapter be interpreted to require services necessitating expenditures in any fiscal year in excess of the fees, and earnings therefrom, collected pursuant to Section

105310. This chapter shall be implemented only to the extent fee revenues pursuant to Section 105310 are available for expenditure for purposes of this chapter." (§ 105305.)

Section 105310 imposes the fees at issue here. In pertinent part, that section imposes fees on manufacturers and other persons formerly and/or presently engaged in the stream of commerce of lead or products containing lead, or who are otherwise responsible for identifiable sources of lead, which have significantly contributed and/or currently contribute to environmental lead contamination. (§ 105310, subd. (a).) The Department must determine fees based on the manufacturer's or other person's past and present responsibility for environmental lead contamination, or its "market share" responsibility for this contamination. (§ 105310, subd. (b).)

Those persons able to show that their industry did not contribute to environmental lead contamination, or that their lead-containing product does not and did not "result in quantifiably persistent environmental lead contamination," are exempt from paying the fees. (§ 105310, subd. (d).)

The Legislature has authorized the Department to adopt regulations establishing the specific fees to be assessed the parties identified in section 105310, subdivision (a). (§ 105310, subd. (b).) The formula for calculating fees attributable to leaded architectural coatings, including ordinary house paint, is set forth in California Code of Regulations, title 17, section 33020.

## II. *Proposition 13*

In June 1978, California voters added article XIII A, commonly known as the Jarvis-Gann Property Tax Initiative or Proposition 13 (article XIII A), to the state Constitution. The initiative's purpose was to assure effective real property tax relief by means of an "interlocking 'package' " consisting of a real property tax rate limitation (art. XIII A, § 1), a real property assessment limitation (art. XIII A, § 2), a restriction on state taxes (art. XIII A, § 3), and a restriction on local taxes (art. XIII A, § 4). (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador Valley*); see also *County of Los Angeles* v. *Sasaki* (1994) 23 Cal.App.4th 1442, 1451 [29 Cal.Rptr.2d 103].)

Section 3 of article XIII A restricts the enactment of changes in state taxes, as follows: "From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods

of computation must be imposed by an Act passed by not less than two-thirds of all members . . . of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

Section 4 of article XIII A imposes similar restrictions on local entities: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose *special taxes* on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)

As we explained in *Amador Valley*, ". . . since any tax savings resulting from the operation of sections 1 and 2 [of article XIII A] could be withdrawn or depleted by additional or increased state or local levies of other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes." (*Amador Valley*, *supra*, 22 Cal.3d at p. 231.)

### III. Taxes or Fees?

 Are the "fees" section 105310 imposes in legal effect "taxes enacted for the purpose of increasing revenues" under article XIII A, section 3, and therefore subject to a two-thirds majority vote? Although we have found no cases that interpret the language of section 3, several California appellate decisions have considered whether various fees are really "special taxes" under article XIII A, section 4. (See also *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 57 [184 Cal.Rptr. 713, 648 P.2d 935] ["special taxes" are taxes levied for a specific purpose rather than for general governmental purposes]; Gov. Code, § 50076 [excluding from the term "special tax" in article XIII A, section 4, "any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes"].) Because of the close, "interlocking" relationship between the various sections of article XIII A (see *Amador Valley*, *supra*, 22 Cal.3d at p. 231), we believe these "special tax" cases may be helpful, though not conclusive, in deciding the case before us. The reasons why particular fees are, or are not, "special taxes" under article XIII A, section 4, may apply equally to section 3 cases.[2]

We first consider certain general guidelines used in determining whether "taxes" are involved in particular situations. The cases agree that

[2]We are not here concerned with issues arising under constitutional amendments effected by a recent initiative measure (Proposition 218) adopted at the November 5, 1996, General Election. That measure contains new restrictions on local agencies' power to impose fees and assessments.

whether impositions are "taxes" or "fees" is a question of law for the appellate courts to decide on independent review of the facts. (*Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1216 [265 Cal.Rptr. 347]; *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 234 [253 Cal.Rptr. 497]; *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1504 [246 Cal.Rptr. 21].)

The cases recognize that "tax" has no fixed meaning, and that the distinction between taxes and fees is frequently "blurred," taking on different meanings in different contexts. (*Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at p. 1504; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 905 [223 Cal.Rptr. 379]; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660 [166 Cal.Rptr. 674]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 983-984 [156 Cal.Rptr. 777].) In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 240 [1 Cal.Rptr.2d 818]; *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 983 ["Taxes are raised for the general revenue of the governmental entity to pay for a variety of public services."].) Most taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges. (*Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at p. 240; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at pp. 1505-1506; see *Terminal Plaza Corp.* v. *City and County of San Francisco, supra,* 177 Cal.App.3d at p. 907.) But compulsory fees may be deemed legitimate fees rather than taxes. (See *Kern County Farm Bureau* v. *County of Kern* (1993) 19 Cal.App.4th 1416, 1424 [23 Cal.Rptr.2d 910].)

█ The "special tax" cases have involved three general categories of fees or assessments: (1) special assessments, based on the value of benefits conferred on property; (2) development fees, exacted in return for permits or other government privileges; and (3) regulatory fees, imposed under the police power. Although these three categories may overlap in a particular case, we consider them separately.

The cases uniformly hold that *special assessments* on property or similar business charges, in amounts reasonably reflecting the value of the benefits conferred by improvements, are not "special taxes" under article XIII A, section 4. (*Evans* v. *City of San Jose* (1992) 3 Cal.App.4th 728, 735-739 [4 Cal.Rptr.2d 601] [assessments on businesses for downtown promotion]; *J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745,

750-758 [203 Cal.Rptr. 580] [facilities benefit assessments]; *City Council v. South* (1983) 146 Cal.App.3d 320, 332 [194 Cal.Rptr. 110] [special assessments on real property]; *County of Fresno* v. *Malmstrom, supra*, 94 Cal.App.3d at pp. 984-985 [special assessments for construction of streets].)

Similarly, *development fees* exacted in return for building permits or other governmental privileges are not special taxes if the amount of the fees bears a reasonable relation to the development's probable costs to the community and benefits to the developer. (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 240 [school facilities fees]; *Bixel Associates* v. *City of Los Angeles, supra*, 216 Cal.App.3d at pp. 1211, 1218-1219 [fire hydrant fees]; *California Bldg. Industry Assn.* v. *Governing Bd., supra*, 206 Cal.App.3d at pp. 235-237 [school facilities development fees]; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra*, 199 Cal.App.3d at pp. 1504-1506 [transit impact fees]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 235-238 [211 Cal.Rptr. 567] [new facilities water hookup fees]; *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325-328 [170 Cal.Rptr. 685] [fees as precondition for building permits]; *Mills* v. *County of Trinity, supra*, 108 Cal.App.3d at pp. 661-663 [fees for processing subdivision, zoning, and land use applications]; see *Ehrlich* v. *City of Culver City* (1996) 12 Cal.4th 854, 898 [50 Cal.Rptr.2d 242, 911 P.2d 429] (conc. opn. of Mosk, J.).)

According to Sinclair, because the present fees have been imposed solely to defray the cost of the state's program of evaluation, screening, and follow-up services for children determined to be at risk for lead poisoning, they are not analogous to either special assessments or development fees, for they neither reimburse the state for special benefits conferred on manufacturers of lead-based products nor compensate the state for governmental privileges granted to those manufacturers. As the Court of Appeal observed, the fees challenged here "do not constitute payment for a government benefit or service. The program described in the Act bears no resemblance to regulatory schemes involving special assessments, developer fees, or efforts to recoup the cost of processing land use applications where the benefit analysis is typically applied. [Citations.] The face of the Act makes clear the funds collected pursuant to section 105310 are used to benefit children exposed to lead, not Sinclair or other manufacturers in the stream of commerce for products containing lead."

 Appellants argue, however, that the challenged fees fall squarely within a third recognized category not dependent on government-conferred benefits or privileges, namely, *regulatory fees* imposed under the police power, rather than the taxing power. We agree.

We have acknowledged that the term "special taxes" in article XIII A, section 4, " 'does not embrace fees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes.' [Citations.]" (*Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111] (*Pennell*), affd. on other grounds *sub nom. Pennell* v. *San Jose* (1988) 485 U.S. 1 [108 S.Ct. 849, 99 L.Ed.2d 1], quoting from *Mills* v. *County of Trinity, supra*, 108 Cal.App.3d at pp. 659-660; see *City of Oakland* v. *Superior Court* (1996) 45 Cal.App.4th 740, 760-762 [53 Cal.Rptr.2d 120] [upholding regulatory fees charged to alcoholic beverage sale licensees to support pilot project to address public nuisances associated with those sales]; *Kern County Farm Bureau* v. *County of Kern, supra*, 19 Cal.App.4th at pp. 1422-1425 [upholding landfill assessment based on land use to reduce illegal waste disposal]; *City of Dublin* v. *County of Alameda* (1993) 14 Cal.App.4th 264, 280-285 [17 Cal.Rptr.2d 845] [upholding waste disposal surcharge imposed on waste haulers]; *Evans* v. *City of San Jose, supra*, 3 Cal.App.4th at p. 737; *San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1145-1149 [250 Cal.Rptr. 420] (*SDG&E*) [upholding emissions-based formula for recovering direct and indirect costs of pollution emission permit programs]; *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 166-168 [154 Cal.Rptr. 263] (*United Business*) [upholding fees for inspecting and inventorying on-premises advertising signs].)

*Pennell* upheld rental unit fees that a city imposed under its rent control ordinance to assure it recovered the actual costs of providing and administering a rental dispute hearing process. (*Pennell, supra*, 42 Cal.3d at p. 375.) We explained in *Pennell* that regulatory fees in amounts necessary to carry out the regulation's purpose are valid despite the absence of any perceived "benefit" accruing to the fee payers. (*Id.* at p. 375, fn. 11; see also *SDG&E, supra*, 203 Cal.App.3d at p. 1146, fn. 18; *Mills* v. *County of Trinity, supra*, 108 Cal.App.3d at p. 661.)

We observe that Sinclair, in moving for summary judgment, did not contend that the fees exceed in amount the reasonable cost of providing the protective services for which the fees are charged, or that the fees were levied for any *unrelated* revenue purposes. (See *Pennell, supra*, 42 Cal.3d at p. 375.) Moreover, Sinclair has not yet sought to establish that the amount of the fees bears no reasonable relationship to the social or economic "burdens" that Sinclair's operations generated. (See *SDG&E, supra*, 203 Cal.App.3d at p. 1146; see also § 105310, subds. (b), (d); *Sea & Sage Audubon Society, Inc.* v. *Planning Com.* (1983) 34 Cal.3d 412, 421 [194 Cal.Rptr. 357, 668 P.2d

664] [persons challenging fees have burden of establishing invalidity].) Sinclair does contend, however, that the Act is not *regulatory* in nature, being primarily aimed at producing revenue.

According to Sinclair, the challenged fees were in effect "taxes" because the compulsory revenue measure that imposed them was not part of a *regulatory* effort. The Court of Appeal agreed, relying on prior cases indicating that where payments are exacted solely for *revenue* purposes and give the right to carry on the business with no further conditions, they are taxes. (E.g., *United Business, supra,* 91 Cal.App.3d at p. 165.) The Court of Appeal held that "Placing the factors distinguishing taxes and fees along a continuum, we conclude the monies paid by Sinclair pursuant to the Act are more like taxes than fees. [¶] *There is nothing on the face of the Act to show the fees collected are used to regulate Sinclair.* Apart from mere calculation of the payment, the Department's regulatory authority involves implementation of the program to evaluate, screen, and provide followup services to children at risk for lead poisoning. The Act does not require Sinclair to comply with any other conditions; it merely requires Sinclair to pay what the Department determines to be its share of the program cost."

Contrary to the Court of Appeal, we believe that section 105310 imposes bona fide regulatory fees. It requires manufacturers and other persons whose products have exposed children to lead contamination to bear a fair share of the cost of mitigating the adverse health effects their products created in the community. Viewed as a "mitigating effects" measure, it is comparable in character to similar police power measures imposing fees to defray the actual or anticipated adverse effects of various business operations.

From the viewpoint of general police power authority, we see no reason why statutes or ordinances calling on polluters or producers of contaminating products to help in mitigation or cleanup efforts should be deemed less "regulatory" in nature than the initial permit or licensing programs that allowed them to operate. Moreover, imposition of "mitigating effects" fees in a substantial amount (Sinclair allegedly paid $97,825.26 in 1991) also "regulates" future conduct by deterring further manufacture, distribution, or sale of dangerous products, and by stimulating research and development efforts to produce safer or alternative products. (Cf. *SDG&E, supra,* 203 Cal.App.3d at p. 1147, fn. 20 [emissions-based fees provide incentive to use nonpollutant fuels].)

Sinclair disputes the state's authority to impose industry-wide "remediation fees" to compensate for the adverse societal effects generated by an industry's products. To the contrary, the case law previously cited or discussed clearly indicates that the police power is broad enough to include

mandatory remedial measures to mitigate the *past, present, or future* adverse impact of the fee payer's operations, at least where, as here, the measure requires a causal connection or nexus between the product and its adverse effects. (See *City of Oakland* v. *Superior Court, supra,* 45 Cal.App.4th at pp. 760-762; *Kern County Farm Bureau* v. *County of Kern, supra,* 19 Cal.App.4th at pp. 1422-1425; *City of Dublin* v. *County of Alameda, supra,* 14 Cal.App.4th at pp. 284-285; *SDG&E, supra,* 203 Cal.App.3d at pp. 1146-1149; *United Business, supra,* 91 Cal.App.3d at p. 168; *Russ Bldg. Partnership* v. *City and County of San Francisco, supra,* 199 Cal.App.3d at pp. 1504-1506 [fees to pay for increased transit costs]; *J. W. Jones Companies* v. *City of San Diego, supra,* 157 Cal.App.3d at pp. 755, 758 [fees to defray costs of additional public facilities]; *Trent Meredith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d at p. 325 [fees to reduce growth impact of new subdivision]; see also *Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 694 [151 P. 398] [police power authorizes legislation necessary or proper for protection of legitimate public interest]; *County of Plumas* v. *Wheeler* (1906) 149 Cal. 758, 761-764 [87 P. 909] [broad legislative discretion to regulate business, including license fees or charges]; 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 784, p. 311 ["police power is simply the power of sovereignty or power to govern—the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare"]; see generally, 6A McQuillan, The Law of Municipal Corporations (3d rev. ed. 1997) Municipal Police Power and Ordinances, § 24.01 et seq., p. 7 et seq.)

*SDG&E* involved regulatory fees comparable in some respects to the fees challenged here. (*SDG&E, supra,* 203 Cal.App.3d 1132.) There, 1982 legislation (see § 42311) empowered local air pollution control districts to apportion the costs of their permit programs among all monitored polluters according to a formula based on the amount of emissions they discharged. (See *SDG&E, supra,* 203 Cal.App.3d at p. 1135.) ▮ The *SDG&E* court observed that "to show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." (*Id.* at p. 1146, fn. omitted; see *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d at pp. 234-235.)

In *SDG&E,* the amount of the regulatory fees was limited to the reasonable costs of each district's program, and the allocation of costs based on emissions "fairly relates to the permit holder's burden on the district's programs." (*SDG&E, supra,* 203 Cal.App.3d at p. 1146.) Accordingly, the

court concluded that the fees were not "special taxes" under article XIII A, section 4. (*SDG&E, supra,* 203 Cal.App.3d at p. 1148.)

As the court observed in *SDG&E,* "Proposition 13's goal of providing effective property tax relief is not subverted by the increase in fees or the emissions-based apportionment formula. A reasonable way to achieve Proposition 13's goal of tax relief is to shift the costs of controlling stationary sources of pollution from the tax-paying public to the pollution-causing industries themselves . . . ." (*SDG&E, supra,* 203 Cal.App.3d at p. 1148.) ▮ In our view, the shifting of costs of providing evaluation, screening, and medically necessary follow-up services for potential child victims of lead poisoning from the public to those persons deemed responsible for that poisoning is likewise a reasonable police power decision. (See also *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 663; *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d at p. 985 [special assessments have no impact on government spending].)

The fact that the challenged fees were charged after, rather than before, the product's adverse effects were realized is immaterial to the question whether the measure imposes valid regulatory fees rather than taxes. *City of Oakland* v. *Superior Court* seems close on point. There, the court upheld city fees imposed on retailers of alcoholic beverages to defray the cost of providing and administering hearings into nuisance problems associated with the prior sale of those beverages. The court first observed that "If a business imposes an unusual burden on city services, a municipality may properly impose fees pursuant to its police powers" to assure that the persons responsible "pay their fair share of the cost of government." (*City of Oakland* v. *Superior Court, supra,* 45 Cal.App.4th at p. 761.) The court concluded that "The ordinance's primary purpose is regulatory—to create an environment in which nuisance and criminal activities associated with alcoholic beverage retail establishments may be reduced or eliminated. Thus, the fee imposed . . . is not a tax imposed to pay general revenue to the local governmental entity, but is a regulatory fee intended to defray the cost of providing and administering the hearing process set out in the ordinance. [Citation.]" (*Id.* at p. 762.)

The court in *United Business* applied the "regulation/revenue" distinction to conclude that sign inventory fees adopted to recover the city's cost of inventorying signs and bringing them into conformance with law were regulatory fees, not revenue-raising taxes. The court observed that, under the police power, municipalities may impose fees for the purpose of legitimate regulation, and not mere revenue raising, if the fees do not exceed the reasonably necessary expense of the regulatory effort. (*United Business,*

*supra*, 91 Cal.App.3d at p. 165, and authorities cited.) Quoting with approval from an earlier decision, the court noted that, if revenue is the primary purpose, and regulation is merely incidental, the imposition is a tax, but if regulation is the primary purpose, the mere fact that revenue is also obtained does not make the imposition a tax. (*Ibid.*) Moreover, according to *United Business,* if a fee is exacted for revenue purposes, and its payment gives the right to carry on business without any further conditions, it is a tax. (*Ibid.*; see also *City of Oakland* v. *Superior Court, supra,* 45 Cal.App.4th at p. 761; *County of Plumas* v. *Wheeler, supra,* 149 Cal. at p. 763 [fee in amount greater than reasonably needed to regulate business "cannot stand as an exercise of the police power"]; *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at pp. 659-660; *City & County of San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445, 450-451 [189 P.2d 32].)

The Court of Appeal, citing *United Business,* stressed that the challenged fees were exacted solely for revenue purposes, and their payment gave Sinclair and others the right to carry on the business without any further conditions. We see two flaws in that analysis. First, *all* regulatory fees are necessarily aimed at raising "revenue" to defray the cost of the regulatory program in question, but that fact does not automatically render those fees "taxes." As stated in *United Business,* if regulation is the primary purpose of the fee measure, the mere fact that the measure also generates revenue does not make the imposition a tax. (*United Business, supra,* 91 Cal.App.3d at p. 165; see also *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d at p. 660 [rejecting broad definition of "tax" as including all fees and charges that exact money for public purposes].)

Second, we find inconclusive the fact that the Act permits Sinclair and other producers to carry on their operations without any further conditions *specified in the Act itself.* As we have indicated, fees can "regulate" business entities without directly licensing them by mitigating their operations' adverse effects. Moreover, as appellants observe, the Act is part of a broader regulatory scheme by which, under various state and federal statutes, the state regulates Sinclair and other manufacturers in the stream of commerce for products containing lead. That being so, Sinclair's payment of the challenged fees did not confer the right to carry on business without any further conditions or regulation.

The Court of Appeal rejected appellants' argument invoking other state and federal regulations: "First, there is nothing on the face of the Act or the accompanying statement of legislative purpose which links the Act's programs for children at risk for lead poisoning with the cited state or federal statutes regulating lead. Second, none of the fees collected pursuant to

section 105310 are used to fund those regulatory efforts." However, it is undisputed that Sinclair and other manufacturers of lead-based products remain subject to government regulation, that payment of the challenged fees therefore does not entitle those manufacturers to operate free of regulation, and that the state must use the funds it collects under section 105310 *exclusively* for mitigating the adverse effects of lead poisoning of children, and not for general revenue purposes. (§ 105310, subd. (f).)

Under existing case law, we can reasonably characterize the challenged fees as *regulatory fees* rather than as taxes. Accordingly, we conclude the trial court erred in granting Sinclair summary judgment on the constitutional issues. Of course, Sinclair should be permitted to attempt to prove at trial that the amount of fees assessed and paid exceeded the reasonable cost of providing the protective services for which the fees were charged, or that the fees were levied for unrelated revenue purposes. (See *Pennell, supra,* 42 Cal.3d at p. 375.) Additionally, Sinclair will have the opportunity to try to show that no clear nexus exists between its products and childhood lead poisoning, or that the amount of the fees bore no reasonable relationship to the social or economic "burdens" its operations generated. (*SDG&E, supra,* 203 Cal.App.3d. at p. 1146; see also § 105310, subds. (b), (d).)

## DISPOSITION

The judgment of the Court of Appeal, affirming the trial court's grant of summary judgment in Sinclair's favor, is reversed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Armstrong, J.,* concurred.

---

*Associate Justice of the Court of Appeal, Second District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.