Filed 2/22/16  The Rehabilitation Center of Beverly Hills v. Dept. of Health Care Services CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE REHABILITATION CENTER OF BEVERLY HILLS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DEPARTMENT OF HEALTH CARE SERVICES et al., <br><br> Defendants and Respondents; <br><br> CALIFORNIA ASSOCIATION OF HEALTH FACILITIES, <br><br> Intervener and Respondent. | C070361 <br><br> (Super. Ct. No. 06CS01592) |

Plaintiffs The Rehabilitation Center of Beverly Hills et al. (Rehabilitation Center), a group of skilled nursing facilities (facilities), challenge the quality assurance fee that is

1

levied on all freestanding facilities. Rehabilitation Center argues that although they are not in the Medi-Cal program and do not accept Medi-Cal patients, they are forced to pay the quality assurance fee but do not receive any enhanced Medi-Cal reimbursement payments. Therefore, the quality assurance fee is an invalid levy under California law. Plaintiffs Ave Maria Hospital et al. (Ave Maria), another group of facilities, echoes these arguments and also contends the quality assurance fee is not a valid levy under the takings clause of the United States Constitution. In the trial court, Rehabilitation Center and Ave Maria (collectively, plaintiffs) filed a complaint mounting a variety of challenges to the quality assurance fee. Ultimately, the trial court determined that the quality assurance fee is a tax as a matter of law, and there is no duty to provide benefits or services in exchange for payment of a tax. On appeal, plaintiffs renew their challenges to the quality assurance fee. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Federal Medicaid Law

The federal Medicaid Act, title XIX of the Social Security Act, title 42 United States Code section 1396a et seq., authorizes federal financial support to states for medical assistance provided to certain low-income persons. State and federal governments finance the program, which is administered by the states. (*Orthopaedic Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1493.) To receive federal financial participation, states must agree to comply with the applicable federal Medicaid law and regulations. (*Alexander v. Choate* (1985) 469 U.S. 287, 289, fn. 1 [83 L.Ed.2d 661].)

Defendant California Department of Health Care Services (Department) administers the state's Medicaid program, Medi-Cal. (Cal. Code Regs., tit. 22, § 50004.) The Department, in accordance with federal law, decides eligible beneficiary groups, types and ranges of services, payment level for services, and administrative procedures. The Medi-Cal program is charged with the responsibility of complying with the state Medicaid plan, which in turn must comply with the provisions of the applicable federal

2

Medicaid law. (42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 430.10, 431.10.) The state Medicaid plan must be submitted to the Secretary of the United States Department of Health and Human Services for approval. The state plan describes the policies and methods to be used to set payment rates for each type of service included. (42 C.F.R. §§ 430.10, 447.201(b).)

Federal Medicaid statutes and regulations permit states to impose certain health care-related taxes and to use those revenues to enhance the federal financial participation in a state's Medicaid program. 42 Code of Federal Regulations part 433.55(a) defines a health care-related tax: "a licensing fee, assessment, or other mandatory payment that is related to--

"(1) Health care items or services;

"(2) The provision of, or the authority to provide, the health care items or services; or

"(3) The payment for the health care items or services." In order for these health care-related taxes to be utilized in the financing of a Medicaid program, the tax must be broad based, imposed uniformly throughout the jurisdiction, and not violate "hold harmless" provisions. (42 U.S.C. § 1396b(w); 42 C.F.R. § 433.68.)

Federal law permits a state to request a waiver of the broad-based requirement, including the uniformity requirement from the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS). (42 U.S.C. § 1396b(w)(3)(E); 42 C.F.R. §§ 433.68(c)(3), 433.72.) CMS has discretion to approve such waivers upon a showing that the net impact of the provider fee is generally redistributive in nature and the amount of the provider fee is not directly correlated to payments for items or services with respect to which the provider fee is imposed. (42 U.S.C. § 1396b(w)(3)(E)(ii); 42 C.F.R. §§ 433.68(c)(2), 433.72(b).)

CMS will consider a hold harmless provision to be in effect if the Secretary of the United States Department of Health and Human Services determines any of the following

3

conditions exist: (1) the state provides for a non-Medicaid payment to payers and the amount of that payment is positively correlated either to the amount of the provider fee or the difference between the amount of the provider fee and the amount of the Medi-Cal payment; (2) all or any of the Medi-Cal payment varies based only upon the amount of the total provider fee paid; or (3) the state provides, directly or indirectly, for any payment, offset, or waiver that guarantees to hold payers harmless for any portion of the costs of the provider fee. (42 U.S.C. § 1396b(w)(5)(C); 42 C.F.R. § 433.68(f).)

**Assembly Bill No. 1629**

The Legislature passed a series of legislative acts aimed at nursing home reform between 2000 and 2004. The legislation established reforms that increased staffing standards, imposed administrative sanctions for poor-performing providers, imposed penalties for noncompliance with requirements, and set forth investigation time frames. (Stats. 2000, ch. 451; Stats. 2001, ch. 685; Stats. 2001, ch. 684; Stats. 2004, ch. 875.) Assembly Bill No. 1075, passed in 2001, mandated the creation of a new, cost-based reimbursement methodology for long-term care facilities that reflected the actual costs of providing care. (Stats 2001, ch. 684, § 3.)

Prior to 2004 Medi-Cal paid facilities a fixed amount per patient day that provided "no incentive for quality care while reimbursing [facilities] about $5000 a year less than it costs to care for these residents." (Assem. Floor Analysis of Assem. Bill No. 1629 (2003-2004 Reg. Sess.) as amended Aug. 24, 2004, p. 6.) In 2004 the Legislature enacted Assembly Bill No. 1629 (Stats. 2004, ch. 875) to create the cost-based reimbursement methodology for long-term care facilities mandated by Assembly Bill No. 1075 (Stats. 2001, ch. 684, § 3) and also to establish the quality assurance fee to defray the costs of implementing the new program.

In enacting Assembly Bill No. 1629, the Legislature stated: "(a) It is the intent of the Legislature to devise a Medi-Cal long-term care reimbursement methodology that more effectively ensures individual access to appropriate long-term care services,

4

promotes quality resident care, advances decent wages and benefits for nursing home workers, supports provider compliance with all applicable state and federal requirements, and encourages administrative efficiency.

"(b) The department shall implement a facility-specific ratesetting system, subject to federal approval and the availability of federal funds, that reflects the costs and staffing levels associated with quality of care for residents in nursing facilities, as defined in subdivision (c) of Section 1250 of the Health and Safety Code . . . ." (Welf. & Inst. Code, § 14126.02.)

Assembly Bill No. 1629 is general fund neutral in its impact. The law requires the state to maintain the same level of funding it would have provided without the quality assurance fee and uses the fee plus matching federal financial participation to defray the remainder of Assembly Bill No. 1629's costs. (Health & Saf. Code, § 1324.28, subd. (b)(3), (4).) Under Assembly Bill No. 1629, the state sought to tap into an additional $250 million a year in new federal Medicaid dollars, needed in a time of budget shortfall. (Assem. Floor Analysis of Assem. Bill No. 1629, *supra*, pp. 6-7.)

Pursuant to Assembly Bill No. 1629, the quality assurance fee is assessed on all skilled nursing facilities, with the exception of some exempt facilities. (Health & Saf. Code, § 1324.21, subd. (a).) The new rate setting mandated by Assembly Bill No. 1629 required the Department to calculate a rate for each facility participating in the Medi-Cal program, based on each facility's actual costs incurred in providing health care services to Medi-Cal beneficiaries. (The Medi-Cal Long-Term Care Reimbursement Act; Welf. & Inst. Code, § 14126 et seq.) This calculation was structured to provide a proportionally greater emphasis on the costs of staffing and wages in order to give facilities an incentive to increase spending on staff and wages. (See Welf. & Inst. Code, § 14126.023, subd. (a).) The bill requires that facilities include in a resident's care assessment a projected length of stay and the resident's discharge potential to better achieve the goal of the resident's returning to the community. (Health & Saf. Code,

5

§ 1418.81.) In addition, the bill requires that the Department assess compliance with minimum staffing requirements among skilled nursing facilities statewide. (Welf. & Inst. Code, § 14126.033, subd. (e)(3).)

Previously quality assurance fee revenues flowed into the state general fund but are now placed in a special fund. (Health & Saf. Code §§ 1324.22, subd. (a), 1324.24, subd. (a).) The state obtains enhanced federal funds to match state funds raised through the quality assurance fees for increased Medi-Cal payments to skilled nursing facilities. (Health & Saf. Code, § 1324.25.) Accordingly, the bill also modified the method and rate of reimbursement to freestanding facilities for providing skilled nursing services to Medi-Cal beneficiaries. (Welf. & Inst. Code, §§ 14126.02, subds. (a), (b), 14126.021.)

The quality assurance fee was intended to improve public access to skilled nursing facilities and to improve the facilities' quality of care. The statute states these funds were intended to enhance federal financial participation in the Medi-Cal program or to provide additional reimbursement to, and support facility quality improvement efforts in, licensed skilled nursing facilities. (Health & Saf. Code, § 1324.25.)

The Legislature passed Assembly Bill No. 1629 with more than a two-thirds vote. In addition, the Legislature voted to extend Assembly Bill No. 1629 and the quality assurance fee in connection with the 2007, 2008, and 2010 budget acts. On each occasion, the Legislature extended Assembly Bill No. 1629 with more than a two-thirds vote of both houses.

## THE LITIGATION

### The Parties

Plaintiffs are skilled nursing facilities operating in California and subject to the quality assurance fee. The facilities have, by choice, either no or a limited number of Medi-Cal patients. Therefore, they receive no, or very little, benefit from the payment of quality assurance fees because of the dearth of Medi-Cal patients. The plaintiffs who do

6

serve a limited number of Medi-Cal patients receive some direct financial benefit in the form of enhanced reimbursement rates for their Medi-Cal patients.

**The Complaint**

Plaintiffs filed their original complaint in 2006. Subsequently, they filed a combined first amended complaint and petition for writ of mandate.

The Department answered the amended pleading. The California Association of Health Facilities (Association), a nonprofit trade association representing long-term health care facilities, intervened in 2007, joining the Department in defending the quality assurance fee.[1] Collectively we shall refer to the Department and the Association as defendants.

The first amended complaint and petition challenges the validity of the quality assurance fee, requests a permanent injunction against assessing the fee, seeks recovery of amounts paid, and requests a peremptory writ of mandate pursuant to Code of Civil Procedure section 1085.

Defendants filed two motions for judgment on the pleadings, resulting in the dismissal of plaintiffs' first cause of action. Plaintiffs filed a motion for summary adjudication with respect to the second, third, fourth, and fifth causes of action. The trial court denied the motion. Subsequently, the Association filed a motion for summary adjudication, which was granted in part. The Department also brought a motion for summary judgment, which was granted in part.

The parties stipulated in 2011 and the trial court ordered a trial based upon written evidence of the remaining causes of action. However, prior to trial the Association filed a "motion for judgment." The trial court granted the motion and issued a statement of decision. We shall discuss the causes of action individually.

---

[1] We deny the Association's motion to request judicial notice filed November 12, 2015.

**First Cause of Action**

Plaintiffs' first cause of action alleges Assembly Bill No. 1629 violates provisions of the Medicaid Act. The trial court dismissed the cause of action, finding it did not have jurisdiction because plaintiffs sought to attack an administrative finding by a federal agency approving the quality assurance fee. The agency, CMS, had not been and could not be joined as a party.

**Second Cause of Action**

The second cause of action asserts that under California decisional law, a fee may not exceed the reasonable cost of the services provided by the fee and challenges Assembly Bill No. 1629 as violative of California law. As to the second cause of action for declaratory relief, the trial court granted the Association's motion for summary adjudication in part. The court found the quality assurance fee is "a governmental levy imposed on all skilled nursing facilities in the State of California [with limited exceptions] for the purpose of funding higher reimbursement rates for the skilled nursing facilities that serve patients under the Medi-Cal program — a levy that was enacted by a vote of more than 2/3 of the Legislature, and that has been reviewed and approved by the federal agency that is responsible for overseeing state Medicaid plans such as California's Medi-Cal program — [and] is properly characterized as a 'tax' rather than a 'fee'. "

Because the levy is a tax, the court reasoned, defendants had no duty to provide benefits or services in exchange for payment. Although the question of "value received" is relevant to the validity of a governmental levy that is properly characterized as a fee, no such question arises when the levy possesses the characteristics of a tax. On appeal, plaintiffs challenge this ruling.

**Second Through Eleventh Causes of Action and Petition for Writ of Mandate**

Following the grant of summary adjudication as to the second cause of action, the trial court dismissed the second through eighth causes of action and the petition for writ of mandate, finding that plaintiffs sought relief which would have the effect of impeding

8

the collection of a tax, the quality assurance fee. Such relief runs afoul of article XIII, section 32 of the California Constitution. As to the ninth cause of action, money had and received, tenth cause of action, breach of implied contract, and eleventh cause of action, unjust enrichment, all of which were predicated on the assertion that plaintiffs received nothing of value in exchange for the fee and sought return of amounts paid, the court ruled defendants are under no duty to provide anything of value in exchange for the payment of a tax.

**Twelfth and Thirteenth Causes of Action**

The twelfth cause of action alleged plaintiffs are entitled to a refund as an illegal and improperly collected tax. The thirteenth cause of action alleged a due process claim. The trial court scheduled trial on these causes of action, and plaintiffs filed trial briefs and supporting evidence. In response, defendants filed motions for judgment.

The trial court dismissed the remaining two causes of action, finding plaintiffs had not sustained the burden of proving the quality assurance fee was invalid on substantive or procedural due process grounds, as an unlawful taking, or as a violation of equal protection. The court reasoned: ". . . the [quality assurance fee] is rationally related to the legitimate public purpose of providing appropriate and high-quality long-term care to the medically indigent through the Medi-Cal program. The fact that plaintiffs, who accept few or no Medi-Cal patients, pay the [quality assurance fee] and receive no benefit in exchange for the payment, while the benefit goes to those [skilled nursing facilities] that do accept Medi-Cal patients, is not a sufficient basis for finding the statutes establishing the [quality assurance fee] to be invalid on the constitutional grounds asserted here." Ave Maria appeals the order dismissing their takings claim.

**Subsequent Proceedings**

The court issued a statement of decision. The court entered judgment in favor of defendants on all causes of action and denied the petition for writ of mandate. Plaintiffs filed a timely notice of appeal.

9

## DISCUSSION

## STANDARD OF REVIEW

When the facts are undisputed and the issue involves statutory and regulatory interpretation, we exercise our independent judgment and review the matter de novo. We review the trial court's findings on factual issues under the substantial evidence standard of review. (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129.)

## LEGISLATIVE INTENT

Rehabilitation Center and Ave Maria both argue that the quality assurance fee is, as its name denotes, a fee and not a tax. In finding otherwise, plaintiffs contend, the trial court ignored relevant authority and failed to defer to the intent of the Legislature.

Rehabilitation Center begins by pointing out that the Legislature titled the levy in question the "Quality Assurance Fee" and that this court has stated, "While this legislative label is not the end of the matter, it certainly is a start." (Quoting *California Taxpayers Assn. v. Franchise Tax Bd.* (2010) 190 Cal.App.4th 1139, 1147.) Ave Maria echoes this assertion, arguing, "In the present case, the Legislature has provided that start by calling the [quality assurance fee] a fee, not a tax."

However, the Legislature's designation of a charge as a fee or a tax does not determine the charge's true nature or whether it is constitutionally permissible. (*Kern County Farm Bureau v. County of Kern* (1993) 19 Cal.App.4th 1416, 1422 (*Kern*); *Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 854-855 (*Northwest Energetic*).) "The character of a tax is ascertained from its incidents, not its label." (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386, 392.) We look beyond the nomenclature or the bare legislative assertion of the tax's designation and determine the real object, purpose, and result of the enactment. (*Sacramento Mun. Utility Dist. v. County of Sonoma* (1991) 235 Cal.App.3d 726, 733.)

10

In a related contention, plaintiffs claim that if the Legislature had used the label of tax rather than fee, the quality assurance fee might not have received sufficient votes. In other words, the Legislature introduced the Trojan horse "fee" in order to sneak a far less popular "tax" into law.

In support of this claim in the trial court, plaintiffs submitted the declaration of former California Assemblymember and Senator Dick Ackerman, who participated in the passage of the bill. Senator Ackerman stated the hostility toward taxes in the Republican caucuses quite possibly led to the designation of the quality assurance fee as a fee rather than a tax. Rehabilitation Center argued the declaration set forth the legislator's interpretation of the legislative intent. The trial court declined to consider those portions of the declaration, finding them purely speculative. Rehabilitation Center argues that, "[a]t a minimum, the court should have considered Senator Ackerman's declaration in its entirety" because it provides a reason why the Legislature went to such great lengths to avoid using the term "tax."

The trial court did not err. A long-established rule of statutory construction is that the testimony of an individual legislator as to his or her intention, motive, or opinion with regard to a piece of legislation is inadmissible. (*City of Los Angeles v. Superior Court* (1985) 170 Cal.App.3d 744, 752.) While an exception is sometimes made where the drafter's views were clearly and prominently communicated to legislators at the time the legislation was being considered, it does not apply to expressions of individual motivation made after the fact. (*C-Y Development Co. v. City of Redlands* (1982) 137 Cal.App.3d 926, 932-933.) Documents that are the subjective intent or views of individual legislators do not constitute evidence of legislative intent. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31, 37-38.)

## TAX OR FEE—PURPOSE AND ATTRIBUTES

The question of "whether impositions are 'taxes' or 'fees' is a question of law for the appellate courts to decide on independent review of the facts." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 873-874 (*Sinclair Paint*).) We look to the actual attributes of the law as enacted in order to arrive at the proper classification. (*Kern*, *supra*, 19 Cal.App.4th at p. 1422.) The Supreme Court has noted that " ' "tax" has no fixed meaning, and that the distinction between taxes and fees is frequently "blurred," taking on different meanings in different contexts. [Citations.]' [Citation.]" (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 437-438 (*Farm Bureau*.)

However, the Supreme Court has also provided guidance on how to focus on the question at hand: "Ordinarily taxes are imposed for revenue purposes and not 'in return for a specific benefit conferred or privilege granted. [Citations.] Most taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other governmental benefits or privileges. [Citations.] But compulsory fees may be deemed legitimate fees rather than taxes. [Citation.]' [Citation.]

"In contrast, a fee may be charged by a government entity so long as it does not exceed the reasonable cost of providing services necessary to regulate the activity for which the fee is charged. A valid fee may not be imposed for unrelated revenue purposes. [Citations.] [Fn. omitted.]

". . . 'Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax.' [Citation.] A regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors. [Citation.] The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors. [Citation.]

12

"Thus, permissible fees must be related to the overall cost of the governmental regulation. They need not be finely calibrated to the precise benefit each individual fee payor might derive. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax." (*Farm Bureau*, *supra*, 51 Cal.4th at pp. 437-438.)

Rehabilitation Center argues the trial court erred by failing to consider the primary purpose of the quality assurance fee, reiterating the Supreme Court's distinction that, at its core, a tax is a levy designed to raise revenue for general purposes, while a fee is designed to confer a specific benefit or privilege. (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.) According to Rehabilitation Center, the Legislature announced the primary purpose: "to enhance federal financial participation in the Medi-Cal program or to provide additional reimbursement to, and to support facility quality improvement efforts in, licensed skilled nursing facilities." (Health & Saf. Code, § 1324.25.) Therefore, the primary purpose is to increase reimbursement rates for Medi-Cal by enacting a " 'Non-Tax Levy.' "

In addition, Ave Maria argues the quality assurance fee is not for general revenue purposes but on its face is narrowly targeted for the specific purpose of enhancing the quality of skilled nursing facilities: "The money is not to be spent on roads, or schools, or any of the other functions of government, but is solely for the purpose of giving the money to skilled nursing facilities, along with matching federal funds, to improve the quality of those facilities. The primary purpose is the specific benefit provided to skilled nursing facilities. No one else benefits directly."

Here, the trial court considered the legislative history of Assembly Bill No. 1629 as well as the text of the legislation itself and found the levy challenged should be characterized as a tax, not a fee. We agree with the trial court's assessment.

13

As the court noted, the purpose of the quality assurance fee is to raise revenue to " 'enhance federal financial participation in the Medi-Cal program or to provide additional reimbursement to, and to support facility quality improvement efforts in, [licensed] skilled nursing facilities.' " (Health & Saf. Code, § 1324.25.) This revenue-raising purpose is echoed in Welfare and Institutions Code section 14126.02, which describes the Legislature's intent to "devise a Medi-Cal long-term care reimbursement methodology that more effectively ensures individual access to appropriate long-term care services, promotes quality resident care, advances decent wages and benefits for nursing home workers, supports provider compliance with all applicable state and federal requirements, and encourages administrative efficiency." (§ 14126.02, subd. (a).)

We also agree with the trial court's observation that the quality assurance fee is compulsory, not voluntary. The quality assurance fee is imposed uniformly on all licensed skilled nursing facilities. Welfare and Institutions Code section 14126.033, subdivision (c)(1) provides that "General fund moneys appropriated for purposes of this article pursuant to Section 6 of the act adding this section shall be used for increasing rates . . . for freestanding skilled nursing facilities . . . ."

In *Sinclair Paint*, the Supreme Court noted that "[m]ost taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges. [Citations.] But compulsory fees may be deemed legitimate fees rather than taxes. [Citation.]

"The 'special tax' cases have involved three general categories of fees or assessments: (1) special assessments, based on the value of benefits conferred on property; (2) development fees, exacted in return for permits or other government privileges; and (3) regulatory fees, imposed under the police power." (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 874.) In connection with the last category, one appellate court has reasoned: " 'Special taxes must be distinguished from regulatory fees imposed under the police power, which are not subject to the constitutional provision [since they are not

14

taxes at all]. [Citation.] Special taxes do not encompass fees charged to particular individuals in connection with regulatory activities or services when those fees do not exceed the reasonable cost of providing the service or activity for which the fee is charged, and are not levied for unrelated revenue purposes.' [Citation.]" (*Kern*, *supra*, 19 Cal.App.4th at p. 1421.)

Courts have also recognized that certain user fees are not taxes. User fees "are those which are charged only to the person actually using the service; the amount of the charge is generally related to the actual goods or services provided." (*Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 597 (*Isaac*).) A user fee is payment for a specific commodity purchased. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 957.)

Regardless of the type of fee, it must bear some reasonable relation to the benefits and costs associated with the service. A special assessment is based on the benefit to a specific property; a development fee is not considered a special tax if it bears a reasonable relation to the development's probable cost to the community and the benefits derived from the community by the development. A regulatory fee is limited to the reasonable cost of the services necessary for the activity for which the fee is charged and for carrying out the regulation's purpose. A user fee is charged to the person using the service, and its amount is generally related to the actual goods or services provided. (*Isaac*, *supra*, 66 Cal.App.4th at pp. 595-597.)

In *Evans v. City of San Jose* (1992) 3 Cal.App.4th 728, the court explained the reason that regulatory and development fees are not considered special taxes: "With each of these cases, a discrete group receives a benefit (for example, a permit to build or inspection of produce) or a service (for example, providing and administering a rental dispute mediation and arbitration hearing process) or a permanent public improvement (such as a local park or landscaped median islands on a local road) which inures to the benefit of that discrete group. The public as a whole may be incidentally benefitted, but

15

the discrete group is specially benefitted by the expenditure of these funds.  [Citations.]
The public should not be required to finance an expenditure through taxation which
benefits only a small segment of the population." (*Id.* at p. 738.)

The quality assurance fee at issue in the present case fits under none of these
scenarios.  Here, instead of a discrete group receiving the benefit, all Medicaid patients in
nursing homes receive the benefit, no discrete service is provided, and no permanent
public improvement is involved.  The public as a whole is benefitted, since Medicaid is
available to all persons who qualify.  Therefore, we disagree with plaintiffs' efforts to
posit the quality assurance fee as a fee.  Nothing in the legislation or the underlying
legislative history suggests the quality assurance fee is intended to support any regulatory
program.  Nor do plaintiffs present any evidence that the quality assurance fee's purpose
was to create a regulatory program.  The revenues raised go to all skilled nursing
facilities serving Medicaid patients, not to a particular program or series of programs.
These factors indicate the quality assurance fee possesses the characteristics of a tax, not
a fee.  (*Northwest Energetic*, *supra*, 159 Cal.App.4th at pp. 859-861.)

**Proposition 26**

In determining that the quality assurance fee is indeed a tax, the trial court
referenced Proposition 26, approved by the voters in the November 2, 2010, General
Election.  Although passed after Assembly Bill No. 1629, we agree with the trial court
that Proposition 26 aids in analyzing the quality assurance fee.

Proposition 26 was an effort to end the practice of misleading labeling:  it targeted
the deliberate mischaracterization of taxes as fees in order to avoid the two-thirds vote
requirement under Proposition 13 for state taxes.

The "Findings and Declarations of Purpose" section of Proposition 26 states, in
part:  "(d) Recently, the Legislature added another $12 billion in new taxes to be paid by
drivers, shoppers, and anyone who earns an income.

16

"(e) This escalation in taxation does not account for the recent phenomenon whereby the Legislature and local governments have disguised new taxes as 'fees' in order to extract even more revenue from California taxpayers without having to abide by these constitutional voting requirements. Fees couched as 'regulatory' but which exceed the reasonable costs of actual regulation or are simply imposed to raise revenue for a new program and are not part of any licensing or permitting program are actually taxes and should be subject to the limitations applicable to the imposition of taxes.

"(f) In order to ensure the effectiveness of these constitutional limitations, this measure also defines a 'tax' for state and local purposes so that neither the Legislature nor local governments can circumvent these restrictions on increasing taxes by simply defining new or expanded taxes as 'fees.' " (Voter Information Guide, Gen. Elec. (Nov 2, 2010) text of Prop. 26, p. 114.)

The quality assurance fee the trial court found to be a tax fits the description of a tax under Proposition 26: an effort to raise revenue for a new program that raises additional reimbursement for skilled nursing facilities to improve quality for patients. The quality assurance fee is not part and parcel of any licensing or permitting program.

Proposition 26 amended the California Constitution to define a tax as: "any levy, charge, or exaction of any kind imposed by the State, except the following:

"(1) A charge imposed for a special benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of conferring the benefit or granting the privilege to the payor.

"(2) A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of providing the service or product to the payor.

"(3) A charge imposed for the reasonable regulatory costs to the State incident to issuing licenses and permits, performing investigations, inspections, and audits, enforcing

17

agricultural marketing orders, and the administrative enforcement and adjudication thereof.

"(4) A charge imposed for entrance to or use of state property, or the purchase, rental, or lease of state property, except charges governed by Section 15 of Article XI.

"(5) A fine, penalty, or other monetary charge imposed by the judicial branch of government or the State, as a result of a violation of law." (Guide, *supra*, text of Prop. 26, p. 115.)

As the trial court noted, the quality assurance fee does not fit within the exceptions listed in Proposition 26. Ave Maria argues the quality assurance fee fits under exception No. 2: "A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of providing the service or product to the payor." However, Ave Maria's argument that the quality assurance fee is charged to them, but they receive no benefit in exchange, belies this claim.

**Unconstitutional Taking**

Ave Maria argues the quality assurance fee amounts to an unconstitutional taking. Ave Maria contends that, as a fee, the quality assurance fee amounts to a taking without just compensation because they receive nothing in exchange for paying it.

However, we have determined the quality assurance fee is a tax, not a fee. Courts acknowledge the state's exercise of its right to taxation is separate and distinct from its exercise of its right to eminent domain, for which just compensation must be given. (*Cohan v. Alvord* (1984) 162 Cal.App.3d 176, 185-186.) California law holds that a tax may be levied without reference to peculiar benefits to particular individuals or property. (*Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 695.)

Here, the quality assurance fee is neither arbitrary nor confiscatory, but a legitimate exercise of the state's power to tax. The primary purpose of the quality

18

assurance fee is to support quality long-term nursing home care for indigent patients, a legitimate public purpose.  We find no violation of Ave Maria's rights to just compensation under the Fifth Amendment to the United States Constitution.

### DISPOSITION

The judgment is affirmed.


          RAYE         , P. J.


We concur:


     BUTZ       , J.


     MAURO      , J.