[No. A113171. First Dist., Div. Three. June 12, 2007.]

STEPHEN COLLIER, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

**COUNSEL**

Chapman, Popok & White, Mark A. White and Carol D. Quackenbos for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, and Wayne Snodgrass, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**PARRILLI, Acting P. J.**—In this appeal, we consider whether the transfer of certain building permit fee revenues from the San Francisco Department of Building Inspection to the San Francisco Planning and Fire Departments violated California Constitution, article XIII A, section 4 (article XIII A, section 4); Government Code section 50076; and the City and County of San Francisco Charter, article IX, section 9.113 (general fiscal provisions) (charter section 9.113).[1] Appellant Stephen Collier seeks a taxpayer's injunction, mandamus and other declaratory relief against respondents City and County of San Francisco, its mayor, controller and board of supervisors (collectively, San Francisco) based on those allegedly improper building permit fee revenue transfers. Both parties filed motions for summary judgment. The trial court granted summary judgment to San Francisco, prompting this appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the record before the trial court when it ruled on the parties' motions for summary judgment. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65 [99 Cal.Rptr.2d 316, 5 P.3d 874].) We consider all the evidence set forth in the parties' moving and opposition papers except that to which objections were made and sustained. (*Id.* at pp. 65–66; Code Civ. Proc., § 437c, subd. (c).)

---

[1] For ease of reference, the City and County of San Francisco Charter and codes can be found at <http://www.municode.com/Resources/> (as of June 12, 2007).

San Francisco has a complex regulatory framework that governs building construction. The department of building inspection (DBI), a chartered department of San Francisco, is central to that regulatory framework. Additionally, the planning department and fire department (hereafter Planning Department, Fire Department) play important roles. The interplay of these departments in relation to the building construction process in San Francisco is discussed below.

*The Department of Building Inspection.*

All persons interested in obtaining a San Francisco building permit must submit an application to DBI. DBI is charged with enforcing the San Francisco Building Codes, which include the housing, mechanical, electrical, and plumbing codes, to ensure safety in the construction and maintenance of San Francisco buildings. It also enforces state building requirements set forth in the Health and Safety Code. (E.g., Health & Saf. Code, §§ 17960, 19120.) Consistent with those enforcement duties, DBI issues building permits only after reviewing the permit applications and performing necessary inspections to ensure the proposed projects are in compliance with the relevant code requirements.

DBI also works with other departments, including the Planning and Fire Departments, to enforce building-related requirements set forth in the various state and local codes. In most cases, after DBI has reviewed and processed a building permit application and conducted any necessary inspections of the building site, DBI routes the application to other departments to conduct their own reviews of the proposed project. Afterwards, the application is returned to DBI for final approval.

DBI collects regulatory fees from building permit applicants to cover the costs of providing services related to the building permit and inspection process. DBI will not issue a building permit unless the applicant pays the regulatory fee. The fee amount varies depending on the value of the proposed building project.[2] The building permit fee revenues, along with revenues DBI collects in the form of fines and other penalties charged for code violations,

---

[2] For example, the building permit fee for a new construction project valued between $501 and $2,000 is "$20.50 for the first $500.00 plus $3.00 for each additional $100.00 or fraction thereof, to and including $2,000.00." (S.F. Bldg. Code, § 110.) For a project valued between $50,001 and $100,000.00, the fee is "$573.00 for the first $50,000.00 plus $6.00 for each additional $1,000.00 or fraction thereof, to and including $100,000.00." (S.F. Bldg. Code, § 110, table 1-A.)

are placed in the Building Inspection Fund (BIF). The BIF is a creation of the San Francisco Administrative Code, which provides in relevant part: "(a) Establishment of Fund. The Building Inspection Fund is established as a category four fund to receive all revenues collected by the Department of Building Inspection, including, but not limited to, application fees, permit fees, plan check fees, the Apartment and Hotel License Fee, and reproduction fees, but excluding Fire Department plan check fees, and Department of City Planning fees shall be deposited into this fund.

"(b) Use of the Fund. This fund shall be used by the Department of Building Inspection, subject to the approval of the Building Inspection Commission exclusively to defray the costs of the Bureau of Building Inspection in processing and reviewing permit applications and plans, field inspections, code enforcement and reproduction of documents." (San Francisco Administrative Code, Chapter 10: Finance, Taxation and Other Fiscal Matters, article XIII: Funds, section 10.100-45 Buliding Inspection Fund (S.F. Administrative Code section 10.100-45).)

Use of fee revenues in the BIF is controlled by the mayor and board of supervisors as part of San Francisco's annual budget process. As a "category four fund" (S.F. Admin. Code, § 10.100-45), the BIF fee revenues are not automatically appropriated for DBI's use; rather, each year the mayor and board of supervisors must make an appropriation of the funds, as directed by San Francisco Administrative Code chapter 10: Finance Taxation and Other Fiscal Matters, article XIII: Funds, section 10.100-1 Administration of Special Funds (S.F. Administrative Code section 10.100-1). Since 1995, the BIF has entirely supported DBI's operations. As such, DBI has received no financial support from San Francisco's general fund or any other source.

*The Planning Department.*

The Planning Department is charged with enforcing the San Francisco Planning Code, which regulates, among other things, the city's land use and zoning practices. As enforcer of the planning code, the Planning Department is also responsible for formulating and implementing San Francisco's state-mandated "general plan." (Gov. Code, § 65300 [requiring each city to adopt a "comprehensive, long-term general plan for [its] physical development"].) A general plan is designed to promote and enforce responsible future growth and development. (*Ibid.*) To that end, the Planning Department's long-range planning division is involved in such activities as preparing and revising the general plan, preparing environmental impact reviews, and updating zoning ordinances.

All land use decisions, including building construction decisions, must be consistent with a city's general plan. (Gov. Code, § 65860, subd. (a)(2); *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 355 [110 Cal.Rptr.2d 579].) As such, no city, including San Francisco, may issue a building permit for a project inconsistent with the general plan. (*Land Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 957–958 [271 Cal.Rptr. 909] ["[i]ssuance of a permit inconsistent with zoning ordinances or the general plan may be set aside and invalidated as ultra vires"] (S.F. Planning Code, § 175.)

Consistent with its enforcement duties, the Planning Department reviews most building permit applications submitted to DBI to ensure compliance with the San Francisco Planning Code, and, in particular, with the general plan. Building permit applications subject to Planning Department review cover projects involving new construction, demolition, or changes to a building's exterior appearance, i.e., projects most likely to implicate the Planning Department's concern for land use and long-term planning. Under section 175, subdivision (a) of the San Francisco Planning Code: "No application for a building permit . . . shall be approved by the Department of City Planning, and no permit or license shall be issued by any City department, which would authorize a new use, a change of use or maintenance of an existing use of any land or structure contrary to the provisions of this Code."

*The Fire Department.*

The Fire Department is charged with enforcing the San Francisco Fire Code, as well as ensuring San Francisco residential buildings and other structures meet certain state-mandated fire safety standards set forth in the Health and Safety Code. (E.g., Health & Saf. Code, §§ 13146, 13143.5, 13217.) Consistent with those responsibilities, the Fire Department may review a building permit application and perform necessary inspections to ensure a proposed project complies with local and state fire standards.

Additionally, the Fire Department works with DBI to enforce San Francisco's sprinkler ordinance, which was enacted in 2002 under the San Francisco Housing and Fire Codes and creates requirements for multitenant single-room occupancy (SRO) hotels.

*The BIF Surplus and San Francisco's Budget Crisis.*

Throughout the last decade, revenues held in the BIF have exceeded DBI's general operating costs nearly every year. As such, the BIF has ended every

fiscal year this decade with a net cumulative surplus. At the end of fiscal year (FY) 1994–1995, the BIF surplus was approximately $2.2 million. By the end of FY 1998–1999, the BIF surplus reached $10.6 million. Then, after dropping to $30,000 at the end of FY 2000–2001 due to an economic downturn, the surplus grew again to approximately $11.5 million at the end of FY 2002–2003.

The director of DBI explained that maintaining a BIF surplus is important so DBI can guard against future contingencies, including fluctuations in the business cycle. Building construction projects, he explained, are uniquely affected by market conditions, as evidenced by the BIF's steep drop in revenues for FY 2001–2002.

While the BIF has enjoyed a comfortable surplus for most of the past decade, San Francisco, to the contrary, has experienced periods of precarious fiscal health. In FY 2002–2003, San Francisco faced a $175 million general fund deficit in balancing the budget. And in preparing the budget for FY 2003–2004, San Francisco projected a gap between revenues and expenses of $347 million. For FY 2004–2005, the gap was projected to reach $352 million.

To address the financial crises of those years, the mayor's budget office examined the propriety of transferring building permit fee revenues in the BIF to other city departments that regulate building construction, to reduce the other departments' reliance on the general fund. In particular, the budget office explored the possibility of transferring BIF fee revenues to the Planning Department to cover its long-range planning costs, which amounted to millions of dollars annually. The budget office reasoned that a logical link existed between long-term planning and the issuance of building permits, and that the Planning Department did not at the time impose fees to cover the costs of long-term planning.

DBI opposed transferring the BIF fee revenues to other departments. DBI pointed out that, in generating a BIF surplus, it had taken steps to eliminate economic waste and improve efficiency, steps other departments may not have taken. DBI also feared reducing the BIF's surplus would interfere with the department's need to prepare for possible revenue losses during economic downturns.

*The BIF Fee Revenue Transfers and Subsequent Expenditures.*

*FY 2003–2004*

In July 2003, San Francisco adopted the FY 2003–2004 annual appropriations ordinance (FY 2003–2004 budget ordinance). The FY 2003–2004

budget ordinance authorized, among other things, transfers from the BIF of $2,298,225 to the Planning Department; $250,000 to the board of supervisors, to be passed through to the Planning Department via a work order; and $250,000 to the Fire Department. The FY 2003–2004 budget ordinance was not unusual. In any given fiscal year, San Francisco's budget ordinance authorizes interfund revenue transfers to reduce pressure on the general fund and to balance out fund surpluses and shortfalls.

The approximately $2.6 million transferred from the BIF to the Planning Department accounted for less than 53 percent of the building permit fee revenues DBI was budgeted to earn in FY 2003–2004, and about 18 percent of the $14.1 million in fee revenues DBI ultimately earned that year. The Planning Department used the transferred fee revenues to finance long-range planning activities, including operation costs of its long-range planning division, on which it spends millions annually but for which it does not directly charge fees.

The Fire Department used the transferred BIF fee revenues to cover costs, including operational and administrative costs, incurred in activities related to building and fire safety and code compliance. Among other things, the Fire Department spent the fee revenues on implementing the sprinkler ordinance, inspecting thousands of residential buildings with three or more units (R-1 buildings), and promoting safety in SRO hotels. The Fire Department at that time did not impose fees to cover costs incurred in connection with those activities.

*FY 2004–2005*

In July 2004, San Francisco adopted the FY 2004–2005 annual appropriations ordinance (FY 2004–2005 budget ordinance). The FY 2004–2005 budget ordinance authorized, among other things, transfers from the BIF of $5,340,952 to the Planning Department; $481,325 to the board of supervisors, to be passed through to the Planning Department via a work order; and $250,000 to the Fire Department.[3] Even with the proposed fee transfers, DBI was projected to end the year with a BIF surplus exceeding $4 million.

The approximately $5.8 million transferred from the BIF to the Planning Department represented less than 52 percent of the building permit fee

---

[3] The Planning Department did not undertake the project for which the $250,000 transfer was passed through the board of supervisors in FY 2003–2004. Accordingly, the $250,000 amount was counted as a credit earmarked for the same purpose in FY 2004–2005.

revenues DBI was budgeted to earn in FY 2004–2005. The Planning Department expected to again spend the transferred fee revenues on long-range planning activities. The Fire Department expected to spend the transferred fee revenues on building and fire safety and code compliance, covering activities such as implementing the sprinkler ordinance, inspecting R-1 buildings, and promoting building safety in SRO hotels.

*This Lawsuit.*

In July 2004, Collier and two other individuals filed this lawsuit, alleging San Francisco's transfers of the BIF fee revenues from DBI to other city departments violated (1) article XIII A, section 4 of the California Constitution and its implementing statute, Government Code section 50076, by creating a special tax unapproved by two-thirds of qualified voters, and (2) section 9.113 of the San Francisco Charter and section 10.100-45 of the San Francisco Administrative Code, by disregarding the BIF's status as a category four special fund whose revenues must be spent solely to defray DBI's building permit-related costs.[4]

On March 25, 2005, the parties filed cross-motions for summary judgment or adjudication. Following a June 2, 2005 hearing on the cross-motions, two individual plaintiffs dismissed all claims without prejudice, leaving Collier as the sole remaining plaintiff. On November 7, 2005, the trial court issued an order granting San Francisco's motion and denying Collier's motion.

In so ruling, the trial court found the BIF fee revenue transfers did not amount to improper special taxes under article XIII A, section 4 because the revenue was not spent on general governmental costs, but rather on regulatory services that benefit or are necessitated by the activities of the class of building permit fee payers. The trial court further found the BIF fee revenue transfers did not violate charter section 9.113, subdivision (a) because that provision created no legal duty on San Francisco to hold the unspent revenues in a specific fund, it merely acknowledged some other law—which plaintiff failed to identify—may create such a duty.[5] This appeal followed.

---

[4] Before plaintiffs filed this case, DBI requested the San Francisco City Attorney hire outside counsel to bring the lawsuit on its behalf, but the city attorney denied DBI's request. Plaintiffs, in filing this lawsuit, initially also challenged transfers of BIF fee revenues to the environment and public health departments, but withdrew their complaint as to those departments in March 2005.

[5] The trial court had previously sustained without leave to amend San Francisco's demurrer to plaintiffs' claim that the transfers violated S.F. Administrative Code section 10.100-45.

## DISCUSSION

Collier contends San Francisco's BIF fee revenue transfers constituted a "special tax," prohibited under article XIII A, section 4 and its implementing statute, Government Code section 50076, absent approval from two-thirds of qualified voters.[6] Collier further contends the BIF fee revenue transfers violated limitations imposed on the use of the revenues under charter section 9.113. Both issues are questions of law, as are the ancillary issues relating to the proper interpretation and application of statutory and constitutional provisions. (*Bixel Associates v. City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1216 [265 Cal.Rptr. 347].) These matters are uniquely within the province of the appellate court, and thus are reviewed independently. (*Ibid.*; *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair Paint*) [whether a particular assessment constitutes a special tax under art. XIII A, § 4 and Gov. Code, § 50076 is a question of law].)

The appellate court likewise reviews independently the legal effect of facts presented to the trial court on a motion for summary judgment or adjudication. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) However, we liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Ibid.*)

*California Constitution Article XIII A and Government Code Section 50076.*

California Constitution, article XIII A, commonly known as Proposition 13 (article XIII A), was enacted by California voters in 1978 to ensure effective real property tax relief. (*Sinclair Paint, supra,* 15 Cal.4th at p. 872.) It consists of four major parts: a real property tax rate limitation (art. XIII A, § 1); a real property assessment limitation (*id.*, § 2); a restriction on state taxes (*id.*, § 3); and a restriction on local taxes (*id.*, § 4). We are concerned here with section 4, which provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."[7]

---

[6] Undisputedly, the BIF fee revenue transfers were implemented without two-thirds voter approval.

[7] Section 4 of article XIII A reflects the fact that any tax savings effectuated by operation of sections 1 and 2 could be withdrawn or depleted should local entities be permitted to enact additional taxes or increase existing taxes unrelated to property. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].)

██ According to our California Supreme Court, because article XIII A's two-thirds vote requirement is inherently undemocratic, "the language of section 4 must be strictly construed and ambiguities therein resolved so as to limit the measures to which the two-thirds requirement applies." (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935].) Article XIII A, section 4 must also be construed in light of its underlying rationale: to shift costs away from the taxpaying public towards the class of individuals that benefits from or necessitates those costs. (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1148–1149 [250 Cal.Rptr. 420].)

After voters passed article XIII A, the California Legislature enacted enabling legislation found at Government Code section 50075 et seq. Government Code section 50076, our focus here, contains the following limitation on the term "special tax": "As used in this article, 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."

██ California courts have subsequently clarified that, based on Government Code section 50076's limitation, "the term 'special taxes' in article XIII A, section 4, ' "does not embrace fees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes." [Citations.]' [Citations.]"[8] (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.) On the other hand, the term "special taxes" does embrace "tax[es] 'collected and earmarked for a special purpose, rather than being deposited in a general fund.' " (*City and County of San Francisco v. Farrell, supra,* 32 Cal.3d at p. 53; *Trent Meredith, Inc. v. City of Oxnard* (1981) 114 Cal.App.3d 317, 323 [170 Cal.Rptr. 685]; see also

---

[8] The "special tax" cases under article XIII A, section 4 have generally involved three categories of fees or assessments: (1) special assessments, based on the value of benefits conferred on property; (2) development fees, exacted in return for permits or other government privileges; and (3) regulatory fees, imposed under the police power. (*Sinclair Paint, supra,* 15 Cal.4th at pp. 874–875.) California law treats these categories somewhat differently. For example, "*special assessments* on property or similar business charges, in amounts reasonably reflecting the value of the benefits conferred by improvements, are not 'special taxes' under article XIII A, section 4." (*Id.* at p. 874.) Similarly, "*development fees* exacted in return for building permits or other governmental privileges are not special taxes if the amount of the fees bears a reasonable relation to the development's probable costs to the community and benefits to the developer." (*Id.* at p. 875.) Although the three categories can overlap in some cases, it is undisputed we are concerned here only with regulatory fees.

*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 700 [37 Cal.Rptr.3d 149, 124 P.3d 719] [" '[i]n general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted' "].)

Here, Collier contends the BIF fee revenue transfers constituted a special tax in violation of article XIII A, section 4 because the revenues, once collected by DBI for the purpose of funding its building permit activities, were diverted to "fund the unrelated operations of . . . other departments." According to Collier, the revenues were thus used by other departments for unrelated revenue purposes, which Government Code section 50076 precludes. Had the Planning and Fire Departments needed additional revenues to fund their unrelated operations, Collier continues, they should have assessed their own regulatory fees rather than taken regulatory fees collected by DBI.

We consider Collier's arguments within the context of Government Code section 50076, which precludes a finding of special tax under article XIII A, section 4 where the regulatory fees at issue are: (1) " ' "charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged," ' " and (2) " ' "are not levied for unrelated revenue purposes." ' " (*Sinclair Paint, supra*, 15 Cal.4th at p. 876.)

### *The Regulatory Fees Were Not Spent for Unrelated Revenue Purposes.*

As an initial matter, we must determine whether to interpret Government Code section 50076's requirement—that regulatory fees not be "levied for unrelated revenue purposes"—to cover this situation, where the issue is whether regulatory fees were *spent* for unrelated revenue purposes. (*Sinclair Paint, supra*, 15 Cal.4th at p. 876.) We conclude such interpretation is appropriate. Underlying article XIII A and Government Code section 50076 is the principle that, "under the police power, municipalities may impose fees for the purpose of legitimate regulation, and not mere revenue raising, if the fees do not exceed the reasonably necessary expense of the regulatory effort." (*Sinclair Paint, supra*, at p. 879.) This principle would lose meaning were we to apply it to the act of imposing regulatory fees, but not to the act of spending the revenues once the fees have been collected. We thus slightly broaden the import of *Sinclair Paint* by holding that a municipality may, under its police powers, spend regulatory fee revenues for the purpose of legitimate regulation so long as those revenues do not exceed the reasonably necessary expense of the regulatory effort. We thus turn to the facts of this case.

The parties agree as a general matter that, under Government Code section 50076, regulatory fees may not be spent for purposes unrelated to the specific regulatory activities for which they were assessed. They disagree, however, on whether the revenues transferred from the BIF, a fund established to receive all revenues collected by DBI, were spent by the Planning and Fire Departments for purposes related to the regulatory activities for which those fees were assessed. Arguing in the negative, Collier narrowly defines the relevant regulatory activities as "DBI's regulatory enforcement of the building codes." Arguing in the affirmative, San Francisco more broadly defines the relevant activities as "the issuance of building permits and . . . building construction."

■ In weighing the parties' positions, we note that, were we to adopt a too narrow definition of "regulatory activities" in applying Government Code section 50076, we would risk depriving municipalities of a reasonable degree of flexibility to determine whether regulatory fee revenues collected by their agencies are being spent in furtherance of the purpose for which those fees were assessed. (*Sinclair Paint, supra*, 15 Cal.4th at pp. 876–877; *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 950 [94 Cal.Rptr.2d 535] ["[t]he legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes . . . [and] [a]n inherent component of reasonableness in this context is flexibility"]; *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 193 [29 Cal.Rptr.2d 128] ["cost allocations for services provided are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity"].) That, in turn, could hinder a municipality's ability to address burdens placed on the community by the activities of certain classes of individuals. A regulatory fee, after all, "is enacted for purposes broader than the privilege to use a service or to obtain a permit. Rather, the regulatory program is for the protection of the health and safety of the public." (*California Assn. of Prof. Scientists, supra*, 79 Cal.App.4th at p. 950.) With this in mind, we consider the regulatory activities relevant to this case.

The regulatory fees at issue are those assessed against persons engaged in building construction in San Francisco to cover services related to building permits and inspections. When those persons submit building permit applications, San Francisco officials must process and review their applications and their building plans, perform all necessary field inspections, ensure compliance with all relevant code provisions, and prepare and reproduce all necessary documents. According to the undisputed evidence produced below, these tasks are the joint responsibility of several departments, including DBI and the Planning and Fire Departments.

For example, while DBI ultimately approves all building permit applications, they do so only if an applicant's proposed building construction project complies with a number of different state and municipal codes, including San Francisco's building, planning and fire codes. Because DBI is not charged with enforcing the planning or fire codes, the Planning and Fire Departments often must review a building permit application and conduct necessary inspections to independently confirm the project's compliance.[9] As a class, the building permit applicants' activities "increase the need for [regulatory] services" from not just DBI, but from other city departments as well, including the Fire and Planning Departments. (See *Russ Bldg. Partnership v. City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1506 [246 Cal.Rptr. 21].)

Given these facts, we agree with San Francisco the relevant regulatory activities for which building permit fees are assessed go beyond DBI's enforcement of the building codes to cover activities performed by the Planning and Fire Departments in conjunction with the building permit process. The question thus becomes whether the BIF fee revenues that were transferred from DBI to the Fire and Planning Departments were used for purposes related to those activities. We conclude they were.

*The Planning Department's Expenditures.*

The Planning Department used the transferred BIF fee revenues to pay for long-range planning activities, including preparing and implementing the general plan and covering overhead and other administrative costs of the department's long-range planning division.[10] The general plan is San Francisco's blueprint for future growth and development. California law requires all cities, including San Francisco, to have and maintain a general plan. (Gov. Code, § 65300.) Moreover, under San Francisco and California law, a proposed building construction project complies with the planning code only so long as it is consistent with the general plan. (See S.F. Planning Code, § 101.1, subd. (d); *id.*, § 108 ["all references in this Code to the 'Master Plan' shall mean 'General Plan' "] and requiring consistency between zoning ordinances and the general plan]; Gov. Code, § 65860 [requiring consistency between city and county zoning ordinances and the general plan].) As such, a building permit for a proposed project may not be approved unless it complies with the planning code *and* the general plan. (Gov. Code, § 65860; S.F. Planning Code, § 175; see also *Land Waste Management v.*

---

[9] DBI's acting director explained, "[DBI's] inspector really becomes a catchall for a number of departments who have stamped the drawings as they've gone through the process to make sure a lot of loose ends get wrapped up before we issue a final certificate of completeness."

[10] The Planning Department spends millions of dollars annually on long-range planning activities related to the general plan, but does not itself assess fees to finance them.

*Contra Costa County Bd. of Supervisors, supra,* 222 Cal.App.3d at pp. 957–958 ["[i]ssuance of a permit inconsistent with zoning ordinances or the general plan may be set aside and invalidated as ultra vires"].) Given this connection between the Planning Department's long-range planning activities and the building permit approval process, we conclude the Planning Department spent the transferred BIF fee revenues for purposes related to the regulatory activities for which those building permit fees were assessed. (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.)

In so concluding, we acknowledge, as Collier points out, that aspects of the general plan relate to the long-range planning needs of specific neighborhoods, rather than of the city as a whole. That fact, however, does not destroy the nexus between long-range planning and the building permit process. The California Legislature has itself acknowledged the link between the general plan and the issuance of building permits. Government Code section 66014, subdivision (b), added by amendment in 2002, expressly provides that costs to prepare and maintain a general plan are part of the reasonable costs of providing the services for which the building permit fees are charged. In drafting this provision, the California Legislature nowhere distinguished between costs to prepare and maintain those aspects of the general plan that affect the city as a whole and those that affect only certain neighborhoods. Where our Legislature declined to make such distinction, we see no reason to make it.[11]

---

[11] In 2002, the California Legislature adopted Assembly Bill No. 2936 (2001–2002 Reg. Sess.) (Assembly Bill 2936), which amended Government Code section 66014, subdivision (a), and added subdivision (b). In recommending adoption of Assembly Bill 2936, the Governor's office explained some local governments already used building permit fees to cover the costs of preparing and revising their general plans, and that the practice was proper: "Local governments charge fees to make zoning changes, issue building permits etc., because there is a legitimate cost to provide these services. Part of that cost is in preparing and maintaining a general plan that provides the basis upon which the decisions related to these services should be made. If a local government does not have the funds to keep its general plan up to date, it will be paralyzed in its ability to make development-related decisions." (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 2936 (2001–2002 Reg. Sess.) Sept. 16, 2002, pp. 1–3.)

Collier complains that Government Code section 66014, subdivision (b) did not become effective until January 2003, after San Francisco had collected nearly all of the BIF fee revenues that were later transferred to the Planning and Fire Departments. We afford no significance to that fact. The legislative history of Assembly Bill 2936 shows Government Code section 66014, subdivision (b) was intended to clarify the legality of the practice of using building permit fees to finance activities related to the general plan; the legislation did not make legal a practice that had previously been illegal. (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 2936 (2001–2002 Reg. Sess.) Sept. 16, 2002, pp. 1–3).)

*The Fire Department's Expenditures..*

The Fire Department used fee revenues transferred from the BIF to pay for its building fire safety activities, including inspecting R-1 buildings to ensure code compliance, promoting fire safety in SRO hotels, and implementing and enforcing San Francisco's sprinkler ordinance. Collier argues those activities were unrelated to the purposes for which the building permit fees were assessed. He reasons that R-1 buildings and SRO hotels are *existing* buildings, and that building permit fees are assessed in connection with *new* construction.

We conclude the evidence proves otherwise. In particular, it was undisputed DBI regularly uses BIF fee revenues for purposes related to existing buildings, including inspecting existing residential tenancies to enforce the building codes. Where DBI uses the BIF fee revenues to enforce code compliance in existing buildings, we see no basis for precluding the Fire Department from doing the same.

In addition, DBI and the Fire Department share responsibility for conducting inspections to ensure compliance with the sprinkler ordinance. Both departments used BIF fee revenues to finance those activities.[12] The trial court found that practice consistent with California law, particularly in light of the flexibility permitted local governments in making certain budgetary decisions. (See *Brydon v. East Bay Mun. Utility Dist., supra,* 24 Cal.App.4th at p. 193; *California Assn. of Prof. Scientists v. Department of Fish & Game, supra,* 79 Cal.App.4th at p. 950.) We agree.

 Specifically, Health and Safety Code section 17951, subdivision (b) authorizes cities to prescribe permit fees "to defray the costs of enforcement required by this part to be carried out by local enforcement agencies." "Local enforcement agencies" includes local fire departments, which "shall enforce in their respective areas all those provisions of this part, the building standards published in the State Building Standards Code relating to fire and panic safety, and those rules and regulations promulgated pursuant to the provisions of this part pertaining to fire prevention, fire protection, the control of the spread of fire, and safety from fire or panic." (Health & Saf. Code, § 17962.) Those "rules and regulations" include local amendments to California building standards (*id.,* § 17958.5), and "rules and regulations for fire and

---

[12] The Fire Department imposes a fee, which DBI collects on its behalf, to cover costs incurred in reviewing sprinkler installation plans submitted as part of the sprinkler permit application process and inspecting sprinkler systems installed pursuant to already approved sprinkler plans. However, this fee does not cover preapplication costs the Fire Department incurs in implementing the sprinkler ordinance, including reviewing SRO's proposed plans for sprinkler installations and inspecting the SRO's to ensure compliance.

panic safety in all hotels, motels, lodging houses, apartment houses and dwellings, buildings, and structures accessory thereto" (*id.*, § 17921, subd. (b)). Given these links between the building permit process and fire safety, we conclude the Fire Department's expenditures of the BIF fee revenues on fire-safety-related activities were reasonably related to the regulatory purposes for which the building permit fees were assessed.

*Government Code Section 66016, Subdivision (a) Is Irrelevant.*

 Government Code section 66016, subdivision (a) sets forth strict procedural guidelines, including public notice and open meeting requirements, that municipalities must adhere to when enacting certain planning and land use fees, including building permit fees.[13] Collier did not plead any violation of Government Code section 66016, subdivision (a) below. He relies on that provision here, however, as "[a]ddditional reinforcement" for his claim that San Francisco violated Government Code section 50076's requirement "that regulatory fees must be spent for the purpose assessed . . . ." Specifically, Collier claims San Francisco's failure to follow the procedural requirements of Government Code section 66016, subdivision (a) when transferring the BIF fee revenues to the Planning and Fire Departments constituted an improper "back-door creation of new regulatory fees." We disagree.

As an initial matter, we note Government Code section 66016, subdivision (a) requires a municipality to adhere to certain procedures when *enacting* a regulatory fee. Here, to the contrary, we are concerned with

---

[13] Government Code section 66016, subdivision (a) provides: "Prior to levying a new fee or service charge, or prior to approving an increase in an existing fee or service charge, a local agency shall hold at least one open and public meeting, at which oral or written presentations can be made, as part of a regularly scheduled meeting. Notice of the time and place of the meeting, including a general explanation of the matter to be considered, and a statement that the data required by this section is available, shall be mailed at least 14 days prior to the meeting to any interested party who files a written request with the local agency for mailed notice of the meeting on new or increased fees or service charges. Any written request for mailed notices shall be valid for one year from the date on which it is filed unless a renewal request is filed. Renewal requests for mailed notices shall be filed on or before April 1 of each year. The legislative body may establish a reasonable annual charge for sending notices based on the estimated cost of providing the service. *At least 10 days prior to the meeting, the local agency shall make available to the public data indicating the amount of cost, or estimated cost, required to provide the service for which the fee or service charge is levied and the revenue sources anticipated to provide the service, including General Fund revenues.* Unless there has been voter approval, as prescribed by Section 66013 or 66014, no local agency shall levy a new fee or service charge or increase an existing fee or service charge to an amount which exceeds the estimated amount required to provide the service for which the fee or service charge is levied. *If, however, the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce the fee or service charge creating the excess.*" (Italics added.)

whether San Francisco created a special tax in violation of California Constitution, article XIII A and Government Code section 50076 when it permitted the Planning and Fire Departments to *spend* the BIF fee revenues. As we have already held, the proper limits placed on a municipality's authority under article XIII A and Government Code section 50076 to spend revenues raised from fees on related regulatory activities are those set forth in *Sinclair Paint, supra,* 15 Cal.4th 866.

Moreover, as San Francisco points out, the BIF fee revenue transfers were made in connection with the city's enactment of the FY 2003–2004 and FY 2004–2005 budget ordinances. Under local law, budget ordinances are enacted only after at least two public hearings and several board of supervisors meetings, which are generally open to the public, have been held. Collier makes no claim, and the evidence does not show, that San Francisco failed to follow those procedures in enacting the FY 2003–2004 and FY 2004–2005 budget ordinances. Nor does he claim San Francisco violated Government Code section 66016, subdivision (a) in enacting the building permit fees. As such, his suggestion that San Francisco violated democratic procedures in transferring the BIF fee revenues pursuant to the budget ordinances is misplaced. (*California Assn. of Prof. Scientists v. Department of Fish & Game, supra,* 79 Cal.App.4th at p. 950 ["legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes"].)

█ Collier relies on Government Code section 66016, subdivision (a) for another reason. Quoting the statutory language, he claims San Francisco was required to use any "revenues [in the BIF] in excess of actual cost . . . to reduce the fee or service charge creating the excess." (Gov. Code, § 66016, subd. (a).) We again disagree. As evidence we have already discussed demonstrates, San Francisco, in exercising its legislative discretion, determined the BIF fee revenue transfers were necessary to cover actual costs incurred by the Planning and Fire Departments in connection with the city's building permit activities—activities related to the purposes for which the building permit fees were assessed. As such, San Francisco did not deem the transferred BIF fee revenues as "revenues in excess of actual cost" within the language of Government Code section 66016, subdivision (a) in weighing the budgetary needs of its various departments. We decline to interfere with San Francisco's judgment. (*County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 699 [222 Cal.Rptr. 429] ["it is, and indeed must be, the responsibility of the legislative body to weigh [budgetary] needs and set priorities for the utilization of the limited revenues available"].) Indeed, Collier himself accepts that, without violating Government Code section 66016, subdivision (a), San Francisco could have decided to retain unused fee revenues in the BIF to protect DBI against future economic downturns, rather than use it to reduce building permit fees.

*The Fees Were in Amounts Necessary to Accomplish the Regulatory Purpose.*

Having concluded the transferred BIF fee revenues were used by the Planning and Fire Departments for purposes related to the regulatory activities for which the fees were assessed, we now must determine whether the fees were in amounts necessary to accomplish those purposes. (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.)

■ "[T]o show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at p. 1146, fn. omitted.) "[R]egulatory fees in amounts necessary to carry out [a] regulation's purpose are valid despite the absence of any perceived 'benefit' accruing to the fee payers." (*Sinclair Paint, supra,* 15 Cal.4th at p. 876.)

Here, San Francisco transferred $2,298,225 in FY 2003–2004 and $5,340,952 in FY 2004–2005 from the BIF to the Planning Department, and $250,000 in both FY 2003–2004 and FY 2004–2005 from the BIF to the Fire Department.

■ With respect to the Planning Department transfers, San Francisco submitted a declaration from the chief administrative officer of the Planning Department detailing the costs incurred by the department in connection with long-range planning. Long-range planning consists of all the activities necessary to prepare, adopt and maintain the general plan, as well as the zoning laws that implement the general plan. As we have already discussed, costs to prepare and maintain a general plan are part of the reasonable costs of providing the services for which the building permit fees are charged. (Gov. Code, § 66014, subd. (b).)

Specifically, this declaration proved the Planning Department incurred costs of at least $2,438,085 for long-range planning activities in FY 2003–2004, including paying salary and fringe benefits to the long-range planning staff and hiring outside contractors. The declaration further proved the Planning Department expected to incur costs of approximately $4,929,380 for long-range planning activities in FY 2004–2005, including paying salary

and fringe benefits to the long-range planning staff, hiring outside contractors, and paying administrative overhead costs.[14]

San Francisco also submitted a declaration from the Planning Department's chief of comprehensive planning that detailed the long-range planning process and its link to the building permit process. In particular, the declaration explained San Francisco's general plan and zoning ordinances, both of which are the result of the long-range planning process, "together constitute the policies and standards that are intended to guide and control the City's future construction and development activity." The declaration also confirmed the Planning Department at the relevant time imposed no fees to cover the considerable costs it incurred conducting long-range planning activities.

The San Francisco Mayor's Office also provided two detailed analyses to explain why the amounts transferred to the Planning Department were appropriate. The first analysis estimated at least 53 percent of all building permit fee revenues received in a three-month period in FY 2002–2003 were generated from permit applications that had been routed from DBI to the Planning Department for review to ensure compliance with the planning code and general plan. The applications routed to the Planning Department involved construction projects, for example, that altered a building's exterior, and thus were most likely to implicate the city's long-range planning concerns.[15] The mayor's office multiplied 53 percent by $14.1 million, the total amount of building permit fee revenues earned in FY 2003–2004, to determine the amount of revenues that could be attributed to the Planning Department's regulatory activities. That figure, approximately $7.5 million, far exceeded the approximately $2.6 million, or 18 percent of the total amount, that was transferred from the BIF to the Planning Department for FY 2003–2004.

The second analysis followed a somewhat different methodology. The mayor's office identified all building permits issued in a nine-month period in FY 2002–2003 involving projects with an assessed valuation of at least

---

[14] By the end of February 2005, the Planning Department had already incurred costs of approximately $1,435,775 for long-range planning activities, including paying salary and fringe benefits to the long-range planning staff, hiring outside contractors, and paying administrative overhead costs. During the same time period, the department incurred approximately $876,206 in administrative overhead costs attributable to its long-range planning activities.

[15] In fact, the Planning Department reviews certain building permit applications that do not involve projects that alter a building's exterior, but nonetheless somehow implicate the city's long-range planning concerns. As such, the mayor's office used a conservative figure to represent the percentage of applications routed to the Planning Department.

$300,000. The mayor's office assumed those projects accounted for the majority of DBI's surplus building permit fee revenues. The mayor's office then calculated that 77 percent of the building permit fee revenues from the sample came from projects whose permit applications had been routed to the Planning Department for review to ensure compliance with the planning code. To be safe, however, the Planning Department reviewed each of those permits to identify which ones involved projects that altered the exterior of a building, and thus had the strongest nexus to long-range planning. The mayor's office then calculated 83 percent of the permits involving large projects involved exterior alterations. Multiplying 77 percent by 83 percent, the mayor's office thus estimated that 64 percent of the total amount of building permit fee revenues could be attributed to the Planning Department's regulatory activities.[16] Based on that figure, it thus concluded the amount transferred to the Planning Department, $5.8 million, was permissible, as it represented less than 53 percent of the $11.1 million in building permit fee revenues DBI was budgeted to collect in FY 2004–2005.

With respect to the Fire Department transfers, the San Francisco Mayor's Office provided no such detailed analyses. Nonetheless, evidence, in the form of a declaration from the Fire Department's deputy chief of administration, proved the amounts transferred, $250,000 in both FY 2003–2004 and FY 2004–2005, were used to cover the Fire Department's direct and indirect costs incurred performing regulatory activities that we have already concluded were related to the building permit process. (Health & Saf. Code, §§ 17951, subd. (b), 17962, 17958.5, 17921, subd. (b).) The evidence proved, for example, the Fire Department (1) incurred costs of approximately $110,000 in FY 2003–2004 and expected to incur costs of $74,400 in FY 2004–2005 enforcing the sprinkler ordinance; (2) incurred costs of at least $686,000 in FY 2003–2004 and expected to incur costs of $579,000 in FY 2004–2005 ensuring the fire safety and code compliance of R-1 residential buildings; and (3) incurred costs of approximately $43,120 in FY 2003–2004 and expected to incur costs of $48,480 in FY 2004–2005 promoting building safety in SRO hotels.

 Collier makes much of the fact that the BIF fee revenues transferred to the Planning and Fire Departments were untraceable to any individual building permit applicant, and thus to any benefit or burden resulting from an applicant's project. In reviewing challenges under Government Code section

---

[16] Again, the mayor's office used a conservative figure because it excluded building permit applications that may have been reviewed by the Planning Department even though the proposed projects did not involve altering a building's exterior.

50076, however, California courts have not required governments to prove a link between their expenditure of fee revenues and their receipt of those revenues from particular fee payers. Rather, California courts have required only that, measured collectively, the regulatory fees received from a class of fee payers are proportional to the costs of the regulatory services necessitated by the activities of that class of fee payers.[17] (*California Assn. of Prof. Scientists v. Department of Fish & Game, supra*, 79 Cal.App.4th at p. 948 [in proving a fee is regulatory rather than revenue raising, the government need not "prove proportionality on an individual basis"]; *id.* at p. 951 [upholding a flat environmental review fee despite concluding "[t]here is no question that a flat fee will seldom represent the exact cost of providing a service"].)

Moreover, to the extent the amounts transferred were not directly correlated to specific, ascertainable costs incurred by the Planning and Fire Departments in connection with the building permit process, they were reasonable estimations of such costs, and thus were sufficient for our purposes: "Regulatory fees, unlike other types of user fees, often are not easily correlated to a specific, ascertainable cost. This may be due to the complexity of the regulatory scheme and the multifaceted responsibilities of the department or agency charged with implementing or enforcing the applicable regulations; the multifaceted responsibilities of each of the employees who are charged with implementing or enforcing the regulations; the intermingled functions of various departments as well as intermingled funding sources; and expansive accounting systems which are not designed to track specific tasks." (*California Assn. of Prof. Scientists v. Department of Fish & Game, supra*, 79 Cal.App.4th at p. 950.)

We conclude San Francisco imposed fees on building permit applicants in amounts permissibly proportional to the reasonable costs incurred by DBI, as well as the Planning and Fire Departments, in providing services necessary to the building permit process. As such, we conclude no basis exists for Collier's claim that San Francisco established a special tax in violation of article XIII A, section 4 and Government Code section 50076 by transferring the BIF fee revenues to the Planning and Fire Departments. (*Sinclair Paint, supra*, 15 Cal.4th at p. 876.)

---

[17] In a related argument, Collier contends (again) the Planning and Fire Departments may have used the transferred BIF fee revenues for activities unrelated to fee payers' building construction projects, such as for specific neighborhood planning projects, fire safety in SRO hotels, and safety planning for natural disasters. For reasons we have already discussed, however, we conclude a sufficient nexus exists between the Planning and Fire Departments' expenditures of the building permit fee revenues on those activities and the purposes for which those fees were assessed.

*San Francisco Charter Section 9.113.*

Collier further contends transferring the BIF fee revenues to the Planning and Fire Departments violated section 9.113, subdivision (a) of the San Francisco Charter, which provides: "Unused and unencumbered appropriations or unencumbered balances existing at the close of any fiscal year in revenue or expense appropriations of the City and County for any such fiscal year, but exclusive of revenue or money required by law to be held in school, bond, bond interest, bond redemption, pension, trust, utility or other specific funds, or to be devoted exclusively to specified purposes other than annual appropriations, . . . shall be transferred by the Controller, at the closing of such fiscal year, to the General Fund."

Collier reasons that, under charter section 9.113, subdivision (a), San Francisco is required to retain any unused and unencumbered fund balances in the BIF at the close of the fiscal year because those funds are "money required by law to be held in . . . specific funds, or to be devoted exclusively to specified purposes other than annual appropriations." The trial court rejected Collier's reasoning: "Charter section 9.113(a) does not itself create a legal duty to hold any unspent monies in particular funds, or even to devote such monies to specific purposes. It simply acknowledges that some other, unspecified laws might create such duties. [Collier] ha[s] not shown, and cannot show, any 'other law' that gives rise to such a duty here."

Collier disagrees, and identifies the "other law[s]" giving rise to a legal duty to retain the unused fee revenues in the BIF as S.F. Administrative Code sections 10.100-1 and 10.100-45.[18] S.F. Administrative Code section 10.100-45 labels the BIF as a "category four" fund. S.F. Administrative Code section 10.100-1 provides that "[a]ny unexpended and unencumbered balance remaining at the close of any fiscal year in fund categor[y] . . . four . . . shall be deemed to have been provided for a specific purpose within the meaning of [former] [s]ection 6.306 [now charter section 9.113] of the Charter and shall be accumulated in the fund."[19]

 Collier's reliance on S.F. Administrative Code sections 10.100-1 and 10.100-45 is misplaced. It disregards that San Francisco effectively amended those provisions by enacting inconsistent budget ordinances in FY 2003–2004 and FY 2004–2005. Those budget ordinances, enacted by San Francisco's

---

[18] As previously mentioned, the trial court sustained without leave to amend San Francisco's demurrer to Collier's claim that the BIF fee revenue transfers independently violated S.F. Administrative Code section 10.100-45.

[19] San Francisco Charter section 6.306 is the predecessor version of charter section 9.113, and contains language nearly identical to that in charter section 9.113, subdivision (a) which Collier claims San Francisco has violated.

board of supervisors, authorized the transfer of unused BIF fee revenues to the Planning and Fire Departments, irrespective of any requirement in S.F. Administrative Code sections 10.100-1 and 10.100-45 to retain them. In doing so, San Francisco acted consistently with its legislative authority. (*Blotter v. Farrell* (1954) 42 Cal.2d 804, 811 [270 P.2d 481] ["the power [of a municipality] to legislate generally includes, by necessary implication, the power to amend or repeal existing legislation"]; see also *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1282 [36 Cal.Rptr.2d 404] ["[a]n appropriation is a legislative act setting aside 'a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose' "].) ■ "[A]lthough repeals by implication are not favored [citation], when, as here, a subsequently enacted specific statute directly conflicts with an earlier, more general provision, it is settled that the subsequent legislation effects a limited repeal of the former statute to the extent that the two are irreconcilable." (*Governing Board v. Mann* (1977) 18 Cal.3d 819, 828 [135 Cal.Rptr. 526, 558 P.2d 1].)

Collier appears to accept, as a general matter, San Francisco's authority to amend or repeal ordinances by enacting subsequent, inconsistent ordinances. Nonetheless, Collier presents three arguments why he claims San Francisco lacked authority to repeal or amend S.F. Administrative Code sections 10.100-1 and 10.100-45. We address each argument in turn.

First, Collier claims San Francisco lacked authority to repeal or amend S.F. Administrative Code sections 10.100-1 and 10.100-45 because section 10.100-1 cross-references charter section 9.113, a charter provision which by law cannot be repealed or amended by ordinance.

■ True, a municipality may not amend or repeal its charter by ordinance. (*Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013, 1034 [2 Cal.Rptr.2d 648] ["a charter bears the same relationship to ordinances that the state Constitution does to statutes"]; *Lucchesi v. City of San Jose* (1980) 104 Cal.App.3d 323, 328 [163 Cal.Rptr. 700] [a city charter may be amended by the majority vote of the electorate but not by ordinance]; *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 [36 Cal.Rptr.2d 521, 885 P.2d 934] ["it is well settled that a charter city may not act in conflict with its charter"].) However, as the trial court found here, charter section 9.113, subdivision (a) imposes no legal duty on San Francisco with respect to revenues held in the BIF. As such, the budget ordinances San Francisco enacted to authorize the transfers of BIF fee

revenues did not purport to amend or repeal charter section 9.113, subdivision (a). Rather, the budget ordinances impliedly amended S.F. Administrative Code sections 10.100-1 and 10.100-45, which, for reasons already discussed, were permissible legislative acts. (*Governing Board v. Mann, supra,* 18. Cal.3d at p. 828.)

Collier next points to San Francisco Administrative Code, Chapter 10: Finance, Taxation, and Other Fiscal Matters, article I: In General, section 10.02 (cash reserve fund and supplemental appropriations) (S.F. Administrative Code section 10.02) as authority for why San Francisco lacked authority to repeal or amend S.F. Administrative Code sections 10.100-1 and 10.100-45.[20] S.F. Administrative Code section 10.02 contains language nearly identical to that upon which Collier relies incharter section 9.113, subdivision (a). And as Collier points out, under another provision of the San Francisco Administrative Code, "all ordinances passed . . . contrary to the provisions of Section 10.02 . . . shall be void." (S.F. Admin. Code, § 10.08-1.)

Collier's argument based on S.F. Administrative Code section 10.02 fails for the same reason his argument based on charter section 9.113 fails: section 10.02, like charter section 9.113, subdivision (a), imposes no legal duty on San Francisco with respect to revenues held in the BIF. As such, S.F. Administrative Code section 10.02 had no effect on San Francisco's authority to repeal or amend S.F. Administrative Code sections 10.100-1 and 10.100-45 by enacting the subsequent inconsistent budget ordinances. (*Governing Board v. Mann, supra,* 18 Cal.3d at p. 828.)

Finally, Collier points to a line of California cases requiring local and state governments to hold in "trust" certain regulatory fees collected and placed in dedicated special-use funds. According to Collier, these "trust fund cases" preclude any finding that a budget ordinance can impliedly repeal or amend a statute establishing dedicated funds by directing the transfer of regulatory fees held in those funds to the state treasury. (E.g., *Riley v. Thompson* (1924) 193 Cal. 773, 776 [227 P. 772] [barring the transfer of harbor pilot fee revenues from a dedicated regulatory fund to the treasury]; *Board etc. Commrs. v. Riley* (1924) 194 Cal. 37, 39 [227 P. 775] [barring the transfer of fishing and hunting permit fee revenues from a dedicated regulatory fund to the general fund].)

---

[20] S.F. Administrative Code section 10.02, provides in relevant part: "Unused and unencumbered appropriations or unencumbered balances existing at the close of any fiscal year in revenue or expense appropriations of the City and County for any such fiscal year, . . . *but exclusive of revenue or money required by law to be held in school, bond, bond interest, bond redemption, pension, trust, utility or other specific funds, or to be devoted exclusively to specified purposes other than annual appropriations,* . . . shall be transferred by the Controller, at the closing of such fiscal year, to a 'cash reserve fund' which is hereby created and which may be used only in the manner authorized by Section 10.08 . . . ." (Italics added.)

Collier's authority is inapposite. The "trust fund doctrine" applies only where a special-use fund is subject to continuous or automatic appropriation. (*California Assn. for Safety Education v. Brown, supra,* 30 Cal.App.4th at p. 1285.) Continuous or automatic appropriation exists where the regulatory agency in charge of the fund is "authorized to collect and immediately spend the money they collect," and thus is not dependent on annual appropriations from the Legislature. (*Ibid.*) Here, S.F. Administrative Code section 10.100-1 expressly provides that the BIF, as a category four fund, is not subject to continuous or "automatic" appropriation. As such, the BIF is not a trust fund, nor governed by the trust fund doctrine. (*California Assn. for Safety Education v. Brown, supra,* 30 Cal.App.4th at p. 1285.)

We thus conclude Collier's claim under charter section 9.113, subdivision (a) fails. As discussed, the BIF is a category four fund specially dedicated for the purpose of receiving revenues collected by DBI. As enacted, S.F. Administrative Code section 10.100-45 required BIF fee revenues to be used exclusively by DBI to defray certain of its costs. (*Ibid.*) S.F. Administrative Code section 10.100-45, read together with S.F. Administrative Code section 10.100-1, required San Francisco to carry forward any fund balance remaining in the BIF at the close of the fiscal year. San Francisco partially amended S.F. Administrative Code sections 10.100-1 and 10.100-45 by enacting inconsistent budget ordinances in FY 2003–2004 and FY 2004–2005. Under those budget ordinances, a portion of the BIF's unused fund balances remaining at the close of FY 2003–2004 and FY 2004–2005 was transferred to the Planning and Fire Departments. For reasons set forth above, those transfers were within San Francisco's authority.

\* \* \* \* \*

In summary, we conclude San Francisco properly transferred the BIF fee revenues, monies collected from building permit applicants, from DBI to the Planning and Fire Departments to cover actual costs incurred by those departments in performing regulatory activities related to the building permit process. (*Sinclair Paint, supra,* 15 Cal.4th at p. 879 [where " 'an unusual burden [is imposed] on city services, a municipality may properly impose fees pursuant to its police powers' to assure that the persons responsible 'pay their fair share of the cost of government' "].) We thus affirm the judgment entered by the trial court.

## DISPOSITION

The judgment is affirmed.

Pollak, J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 19, 2007, S154663.