Filed 2/26/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| ROLLAND JACKS et al., | 2d Civil No. B253474 |
| Plaintiffs and Appellants, | (Super. Ct. No. 1383959) |
| | (Santa Barbara County) |
| v. | |
| CITY OF SANTA BARBARA, | |
| Defendant and Respondent. | |

Appellants are an individual and a hotel who incurred a one percent surcharge on their electricity bills (1% surcharge) collected by Southern California Edison (SCE) and remitted to respondent City of Santa Barbara (City). The City did not seek voter approval of the 1% surcharge. SCE collects it pursuant to an ordinance and franchise agreement with the City. The California Constitution, as amended by Proposition 218, prohibits local governments from imposing new or increased taxes without first obtaining voter consent. (Cal. Const., art. XIII C, § 2.)

We conclude that the 1% surcharge is an illegal tax masquerading as a franchise fee. (See *In re Estate of Claeyssens* (2008) 161 Cal.App.4th 465, 467.) Our decision in *Santa Barbara County Taxpayer Assn. v. Board of Supervisors* (1989) 209 Cal.App.3d 940 (*SBC Taxpayers*), to the extent it is relevant in the context of Proposition 218, is distinguishable. *SBC Taxpayers* concerned traditional franchise fees collected for grants of rights of way rather than, as here, a surcharge collected for general revenue purposes. Therefore, we reverse and remand.

FACTS AND PROCEDURAL BACKGROUND

For more than 50 years, SCE has provided electricity to the City pursuant to a series of franchise agreements allowing SCE to use the City's streets and other property. In 1994, as a 10-year franchise agreement was expiring, the City and SCE began negotiating the terms of a possible franchise renewal. Because the negotiations for a new long-term agreement took longer than anticipated, they entered into five one-year extensions in the interim.

The expiring agreement and subsequent extensions required SCE to pay the City a "franchise fee" of one percent of SCE's gross annual receipts for electricity sold within the City (1% franchise fee). During the negotiations, the City proposed increasing the SCE franchise fee from one percent to two percent of SCE's revenue from City customers, the difference being the 1% surcharge, in order to raise revenues for general governmental purposes.[1] In responding to the City's proposal, SCE took into account a 1989 Public Utilities Commission (PUC) decision establishing "Guidelines for the Equitable Treatment of Revenue-Producing Mechanisms Imposed by Local Government Entities on Public Utilities" (1989 PUC decision).

The 1989 PUC decision sought to address a growing inequality among utility customers in terms of the benefits they received for the rates they paid. Prior to the passage of Proposition 13 in 1978, local government entities raised revenue—which they in turn spent on local services—primarily through property taxes. Local officials generally could increase local taxes without voter approval. Although local governments within a public utility's service area imposed upon the utility some non-property taxes, including franchise fees, these local taxes tended to average out equally in the aggregate. Thus, the utility could roll these costs into its basic rates applicable to all ratepayers without resulting in inequitable differences where one jurisdiction's taxpayers would be subsidizing the tax revenues flowing to another.

---

[1] In the eventual franchise agreement, half of the 1% surcharge was to be paid to the City's general fund and the other half paid to the City's undergrounding projects fund. In 2009, the City reallocated the 1% surcharge funds entirely to its general fund.

In passing Proposition 13, the voters set property value for tax purposes at 1976 levels and restricted any increase in valuation to no more than one percent per annum. In addition, they eliminated local governments' authority to raise property taxes to secure general obligation bonds. Proposition 62, enacted in 1986, further limited local governments' ability to raise revenue in that it required a majority popular vote for any increase in local general purpose taxes. These changes caused many cities to rely on revenue-producing mechanisms other than property taxes. The PUC became concerned that the increasing number of such mechanisms and amounts that they produced would create inequities among classes of utility ratepayers. In response, it authorized public utilities to seek its approval, via an advice letter, to impose a surcharge on local utility customers when the franchise fees and other specified local taxes and fees "in the aggregate significantly exceed the average aggregate of taxes or fees imposed by the other local governmental entities within the public utility's service territory." These surcharges appear as a separate line item on a customer's bill and identify the local government entity responsible for them.

In light of the 1989 PUC decision, SCE proposed and the City accepted an arrangement in which the increase in the franchise fee sought by the City was contingent on the PUC authorizing the additional one percent to be treated as a surcharge. Their agreement was memorialized in December 1999 in City Ordinance No. 5135 and became effective upon SCE's filing its written acceptance.

Under the terms of the renewed franchise agreement, SCE would continue to pay the City the 1% franchise fee for 30 years. SCE's obligation to pay the 1% surcharge would begin 60 days after the PUC's approval of it, which SCE was required to "use all best efforts" to obtain. If the PUC did not approve the 1% surcharge within a specified period of time,[2] or if a legislative, judicial, or PUC decision invalidated the 1% surcharge in part or in whole, then SCE would not have to collect or pay it. In that case,

---

[2] The agreement originally set a three-year deadline for SCE to obtain approval of the 1% surcharge. Due to uncertainty surrounding California's energy deregulation, the parties subsequently extended this deadline.

3

the franchise term would become year-to-year until either party terminated it. If the PUC or a court were to order that the 1% surcharge collected from electricity users be returned to them, the City would be solely liable for the repayments.

In November 2005, following the PUC's approval of the 1% surcharge, SCE began billing and collecting it from the City's electricity users and remitting the revenues to the City. The 1% surcharge was expected to generate approximately $600,000 in revenue each year and increase the monthly electricity bill for a typical residential customer by about 54 cents. It was never submitted to or approved by City voters.

Appellants filed a class action complaint. They sought an order declaring that the 1% surcharge is invalid under Proposition 218 as a tax imposed without voter approval, enjoining the City from its further collection, and requiring the City to repay the revenues already collected. Appellants moved for summary adjudication of the liability issues and the City sought summary judgment. The City asserted that the 1% surcharge is part of its franchise fee and, as such, is not a tax. In addition, it argued that the PUC had exclusive jurisdiction to approve the 1% surcharge, that appellants failed to exhaust their administrative remedies by seeking rehearing of the PUC's approval of SCE's advice letter, that their challenge to that approval is time-barred, and that both SCE and the PUC are indispensable parties to this action.

The trial court rejected the City's defenses regarding jurisdiction, exhaustion, timeliness, and indispensable parties, but accepted its argument that the 1% surcharge is part of the franchise fee and does not qualify as a tax under Proposition 218. The court found that the 1% surcharge *does* constitute a tax under the 2010 amendments to article XIII C of the California Constitution brought about by Proposition 26.[3] Ultimately, however, the court ruled that Proposition 26's definition of "tax" does not

_____

[3] Proposition 26 sought to further tighten Proposition 218's restrictions on local revenue-generating measures by defining "tax" broadly to mean "any levy, charge, or exaction of any kind imposed by a local government" that did not fall within one of seven enumerated exceptions. (Cal. Const., art. XIII C, § 1, subd. (e); *Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County* (2013) 218 Cal.App.4th 195, 198, 203 & fn. 6.)

4

apply retrospectively to the 1999 franchise agreement.  Accordingly, the court entered judgment in favor of the City.

DISCUSSION

The sole issue before us is whether the 1% surcharge is a tax subject to Proposition 218's voter approval requirement or a franchise fee that may be imposed by the City without voter consent.

We review a trial court's grant of summary judgment de novo.  (*William Jefferson & Co., Inc. v. Assessment Appeals Board* (2014) 228 Cal.App.4th 1, 9.) Likewise, the determination whether an imposition is a "tax" or a franchise "fee" is a legal question for this court to decide de novo.  (*Southern California Edison Company v. Public Utilities Commission* (2014) 227 Cal.App.4th 172, 197.)  In interpreting Proposition 218, we must liberally construe its provisions "'. . . to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.'"  (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448.)

Proposition 218 prohibits local governments from imposing "taxes" without voter approval but does not tell us what "taxes" means.**4**  (*Schmeer v. County of Los*

---

**4** In dictum, the Third Appellate District recently suggested that "Proposition 218[] exempt[ed] electrical and gas service from its provisions."  (*Citizens for Fair REU Rates v. City of Redding* (2015) 233 Cal.App.4th 402 ["The issue of whether [an electric utility's payment to the city that it recouped from ratepayers] constitutes a tax or a fee arises only after the adoption of Proposition 26 because Proposition 218 previously excluded fees for gas and electrical service from the voter approval requirement"].)  This statement of the law is at best inaccurate.

Structurally, Proposition 218 has two parts, set forth in articles XIII C and XIII D of the California Constitution.  Article XIII C, with which we are solely concerned here, pertains to voter approval of local government taxes.  Article XIII D establishes additional procedures, requirements, and voter approval mechanisms for assessments on real property and property-related fees and charges.  (Cal. Const., art. XIII D, §§ 1, 2, subds. (b), (e); *City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926, 931.)  Article XIII D, section 3, upon which *Citizens for Fair REU Rates* relies, provides that "*[f]or purposes of this article*, fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership."  (Cal. Const., art. XIII D, § 3, subd. (b), italics added.)  This provision merely clarifies that user fees for gas and electricity are not subject to article XIII D's additional requirements for property-related exactions.  It says nothing about whether a local revenue measure

5

*Angeles* (2013) 213 Cal.App.4th 1310, 1320.) The term "has no fixed meaning, and . . . the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 (*Sinclair Paint*).) "In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted. [Citations.]" (*Ibid.*)

In contrast, the definition of "franchise fee" has been constant for nearly a century. A franchise fee is a "charge which the holder of the franchise undertakes to pay as part of the consideration for the privilege of using the avenues and highways occupied by the public utility." (*Tulare County v. City of Dinuba* (1922) 188 Cal. 664, 670; accord, *City of Santa Cruz v. Pacific Gas & Elec. Co.* (2000) 82 Cal.App.4th 1167, 1171.)

"'Although the classification of a revenue-producing device can be determinative of the lawfulness of the device, courts look to the actual attributes of the device as enacted in order to arrive at the proper classification; *the label attached to the device by the local government is not determinative*.' [Citation.]" (*Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1038.) In *Sinclair Paint*, the California Supreme Court adopted a "primary purpose" test for determining whether a regulatory fee should be deemed a tax. We will apply the same test to distinguish between legitimate franchise fees and illegitimate taxes masquerading as such. Thus, "if revenue is the primary purpose, and [compensation for the franchise] is merely incidental, the imposition is a tax, but if [compensation for the franchise] is the primary purpose, the

labeled an electricity "user fee" but actually a tax is subject to the voter approval requirement of Article XIII C. In fact, it is.

"The ballot arguments in favor of Proposition 218 emphasized the guarantee of the right to vote on taxes even if denominated 'fees,' *including the right to vote on utility taxes*. ('Proposition 218 guarantees your right to vote on taxes imposed on your water, gas, electric, and telephone bills.' . . .)" (*Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1196, italics added.) Several cases have held that utility user taxes imposed on the use of electricity are subject to Proposition 218's voting requirement. (E.g., *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1186.) Thus, to the extent *Citizens for Fair REU Rates* stands for the proposition that local gas and electricity taxes are categorically exempt from the voter approval requirement of article XIII C, section 2, which Proposition 26 left unaltered, we disagree.

6

mere fact that revenue is also obtained does not make the imposition a tax." (*Sinclair Paint*, *supra*, 15 Cal.4th at p. 880.)

To determine the primary purpose of the 1% surcharge, we begin by looking at the substantive provisions of the franchise agreement. (See *Weisblat v. City of San Diego*, *supra*, 176 Cal.App.4th at p. 1041.) The agreement treats the 1% surcharge differently than the 1% franchise fee. It calls for SCE to pay the 1% franchise fee, leaving the funding source entirely to SCE's discretion. In exchange, SCE gains the right to use City property to sell electricity to City residents. By paying the 1% franchise fee, SCE is guaranteed the franchise for at least three years and, thereafter, until either party terminates it. The agreement's definite term can be extended from three years to a total of 30 years if, after obtaining regulatory approval, SCE collects the 1% surcharge from electricity customers in the City and remits the revenue to the City.

The 1% franchise fee resembles a traditional franchise fee. Its purpose is to compensate the City for allowing SCE a right of way to purvey electricity. The 1% surcharge is something else entirely. Its purpose was "to raise franchise fee revenues for use by the City Council for general City governmental purposes." The franchise agreement became effective, and SCE had the privilege of using the City's property, regardless of whether or not the PUC authorized SCE to impose the 1% surcharge. The only benefit to SCE from acting as the City's agent in collecting the 1% surcharge was to know with certainty how long the franchise would last. As the trial court found, "[f]rom the perspective of the utility consumer, there is no functional difference between the [1% surcharge] and a utility user[] tax."

A utility user tax, unlike franchise fees and other local government fees and taxes, is not incorporated into the utility's rate structure and is not subsidized by the utility's customers outside the city. It is "purely a 'pass-along' tax, with the utility acting as a tax collector for the city." (1989 PUC decision, at pp. 6-7.) "Generally, these taxes are levied as a percentage of the utility bill, but from the affected customer's viewpoint they merely result in a higher utility bill for the same level of service received. From the city's viewpoint some of the onus is deflected against the utility since the tax billing does

7

not appear on the city letterhead." (*Id.* at p. 9.) Utilities may, in their discretion, set forth the utility user tax as a separate line item amount in a utility bill. (*Id.* at p. 32.)

By statute, utilities have a variety of protections against claims that the utility user taxes they collect are illegal. They "have no duty to independently investigate or inquire with the local jurisdiction concerning the validity of the tax ordinance." (Pub. Util. Code, § 799, subd. (a)(1).) They cannot be held "liable to any customer as a consequence of collecting the tax." (*Id.* at subd. (a)(2).) "In the event a local jurisdiction is ordered to refund the tax, it [is] the sole responsibility of the local jurisdiction to refund the tax." (*Id.* at subd. (a)(3).) "[I]n any action seeking . . . to invalidate the tax[], the sole necessary party defendant in the action [is] the local jurisdiction on whose behalf the taxes are collected[,] and the public utility or other service supplier collecting the taxes [cannot] be named as a party in the action." (*Id.* at subd. (a)(4).)

The franchise agreement here specifies that SCE must collect the 1% surcharge from electric utility customers it serves within the City rather than from its entire customer base. The collection is applied to all of SCE's customers in the City equally based on their electricity consumption. Pursuant to the 1989 PUC decision, which the franchise agreement expressly incorporates, the 1% surcharge must be included in customer bills as a separate item identifying the City as the entity responsible for it. If SCE is prevented by law from collecting the 1% surcharge, it must stop collecting and remitting it. If the PUC or a court orders that the 1% surcharge be returned to ratepayers, the City is "solely responsible for such repayment."

In short, the 1% surcharge bears all the hallmarks of a utility user tax. More importantly, its primary purpose is for the City to raise revenue from electricity users for general spending purposes rather than for SCE to obtain the right of way to provide electricity. This constitutes a tax under Proposition 218 and is subject to approval by the electorate.

We have stated that "fees paid for franchises are not taxes, user fees or regulatory licenses," but instead are matters of contract. (*SBC Taxpayers*, *supra*, 209 Cal.App.3d at pp. 949-950; see also *Tulare County v. City of Dinuba*, *supra*, 188 Cal. at

8

p. 670 [stating that a franchise fee "is purely a matter of contract"].) But we explained the reason for this distinction is that "[f]ranchise fees are paid as compensation for the grant of a right of way." (*SBC Taxpayers*, at p. 949.) In that way, our holding was limited in scope: "franchise fees *collected for grants of rights of way* are not '"proceeds of taxes"' under article XIII B, section 8, subdivision (c) [of the California Constitution]."[5] (*Id.* at p. 950, italics added.) Here, the 1% surcharge is not being collected for a grant of a right of way but rather for revenue purposes.

We decided *SBC Taxpayers* before *Sinclair Paint* clarified that the classification of a revenue-generating mechanism as either a tax or a fee turns on its primary purpose. In the typical case where a franchise contract requires the utility to pay a fee to use city property, without specifying where the revenue must come from, the fee likely will be contractual in nature rather than a hidden tax. This is consistent with *SBC Taxpayers*. Here, however, the franchise agreement does not require SCE to pay the 1% surcharge, but merely to act as the City's agent in collecting it from electricity users in the City. Moreover, the only purpose of the 1% surcharge is to provide the City with additional revenue for general spending. That, in Proposition 218 parlance, is a tax. (Compare *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 927 [in lieu fee—i.e., franchise fee paid by city-owned utility—though subject to Proposition 218, is not a tax when it is levied directly on the utility rather than on the ratepayers and "the utility departments are not required to recover the in lieu fee from ratepayers in any particular manner"] with, e.g., *Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 131 [utility user tax, the proceeds of which are deposited in the county's general fund and not earmarked for any specific project, is a general tax for Prop. 218 purposes].)

---

[5] We note that *SBC Taxpayers* involved article XIII B, prior to the enactment of article XIII C by Proposition 218. There is no reason to assume that "proceeds of taxes" in article XIII B means the same thing as "taxes" in article XIII C. (Cf. *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 215 ["Comparing the provisions of article XIII C and article XIII D, it appears to us that the words 'fee' and 'charge,' which appear in both articles, may well have been intended to have a narrower, more restrictive meaning in article XIII D"].)

The City argues that the 1% surcharge is a traditional franchise fee simply because its collection from the taxpayers and remittance to the City is one of SCE's obligations under the franchise agreement. The untenability of the City's position is apparent from the 1999 franchise agreement itself, which obligates SCE to collect and remit any utility user tax that the City imposes. Under the City's reasoning, any such utility user tax, the collection of which being contractual in nature, would also be a franchise fee not subject to voter approval.

The reason that a traditional franchise fee is not normally a tax is not just that it is contractual in nature. It is not a tax because its primary purpose is consideration for the right of way rather than simply to raise revenue. Cities cannot avoid Proposition 218's requirements merely by contracting out the collection of otherwise unlawful taxes.

In this case, three factors support the conclusion that the 1% surcharge is a tax and the 1% franchise fee is not: (1) SCE's ability to use the City's property is contingent on its paying the 1% franchise fee but not the 1% surcharge; (2) SCE is not required to recoup the 1% franchise fee in any particular way from any particular group but is required to collect the 1% surcharge from utility users within the City; and (3) the 1% surcharge exceeds the prevailing rate for franchise fees in SCE's territory.[6]

Amicus curiae League of California Cities (League) argues that the 1% surcharge is not a tax because it was not "imposed" but instead "was freely negotiated between voluntary market participants of comparable market power." There are two basic flaws in this argument. First, the League wrongly assumes that the amount of the agreed-upon franchise fee is "depend[ent] on the relative market power of buyers and sellers." In fact, the market for utility franchise rights bears no resemblance to a competitive market. The City can exercise its monopoly power to impose whatever franchise fee it likes. SCE, while not without market power of its own, has little

---

[6] We do not mean to suggest that the City's hypothetical franchise agreement "providing for a franchise fee of 2%, with no conditions precedent," would necessarily fall outside of Proposition 218's scope. If the prevailing franchise fee within the utility's territory is 1% and the primary purpose for the additional 1% fee is to provide the City with general revenue, then it may be that voter approval is required. Those facts are not before us.

10

incentive to resist whatever fee the City demands. As a result of the 1989 PUC decision, any portion of the franchise fee exceeding the prevailing rate in SCE's service territory can be passed through to electric customers in the City and billed as a City-imposed surcharge. (See *Southern Cal. Gas Co. v. Public Utilities Com.* (1979) 23 Cal.3d 470, 474 ["As taxes are part of a utility's cost of service, this expense is borne by the ratepayers"].)

Of course, the City's ability to impose exorbitant franchise fees is not unfettered. At some level of taxation, irate voters will express their displeasure at the ballot box. But to allow such a state of affairs would turn Proposition 218 on its head. The point of Proposition 218 is that cities must obtain voter approval of taxes *before* imposing them. Otherwise, cities could impose many taxes that a majority of the electorate opposes but is powerless to repeal due to collective action problems. (See Kousser & McCubbins, *Social Choice, Crypto-Initiatives, and Policymaking by Direct Democracy* (2005) 78 So.Cal. L.Rev. 949, 956-957; Olson, The Logic of Collective Action: Public Goods and the Theory of Groups (2d ed. 1971) pp. 127-128.)

The other basic flaw in the League's argument is its assumption that the 1% surcharge was imposed on SCE. As we have explained, it was actually imposed on the utility users. SCE is merely a conduit through which the tax revenues flow with no real interest in the tax's validity or amount.

The League also asserts that cities will face a parade of horribles if they cannot rely on franchise fee revenue. It notes that the median California city receives 5.8 percent of its general revenue from franchise fees. We are not foreclosing *legitimate* franchise fees, however; only those that are in effect utility user taxes masquerading as franchise fees. It is not an onerous requirement that local governments seek taxpayers' consent before subjecting them to new and increased taxes. And even if it were, that is what the California Constitution requires. If cities find this burden too great, their recourse is to convince the voters of the need for constitutional change.[7]

---

[7] In a footnote, the City states that it "disagrees with the trial court's rejection of its jurisdictional defenses" but "will not brief those defenses in the alternative here." We

11

DISPOSITION

The judgment is reversed and this matter remanded. The trial court is directed to grant appellants' motion for summary adjudication because the City imposed the 1% surcharge without complying with Proposition 218. Costs to appellants.

**<u>CERTIFIED FOR PUBLICATION</u>.**


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

---

decline to consider issues presented only in a footnote (*Evans v. CenterStone Development Co.* (2005) 134 Cal.App.4th 151, 160), and in the absence of cogent legal argument or citation to authority, we treat the contentions as waived (*In re Marriage of Falcone* (2008) 164 Cal.App.4th 814, 830). We also need not reach any issues regarding Proposition 26 given both our holding that the 1% surcharge is subject to Proposition 218 and appellants' failure on appeal to challenge the trial court's ruling that Proposition 26 does not apply retrospectively.

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

––––––––––––––––

Huskinson, Brown & Heidenreich, David W.T. Brown, and Paul E. Heidenreich for Plaintiffs and Appellants.

Ariel Pierre Calonne, City Attorney, Tom R. Shapiro, Assistant City Attorney; Jarvis, Fay, Doporto & Gibson, Benjamin P. Fay, Rick W. Jarvis and Andrea Saltzman for Defendant and Respondent.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, and Ryan Thomas Dunn for League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.